**STATE, Plaintiff-Appellee, v. GOOD, Defendant-Appellant.**

Ohio Appeals, Tenth District, Franklin County.

No. 6001.   Decided February 23, 1960.

Earl W. Allison, Pros. Atty., Albert G. Giles, Asst. Pros. Atty., for plaintiff-appellee.

George E. Tyack, Irving M. Gertner, for defendant-appellant.

(HURD, PJ, KOVACHY and SKEEL, JJ, of the Eighth District, sitting by designation in the Tenth District.)

## OPINION

By SKEEL, J.

This appeal comes to this court on questions of law from a judgment of guilty upon the verdict of a jury in the Court of Common Pleas of Franklin County. The defendant was charged on eight counts of an indictment returned by the Grand Jury of Franklin County. Four of the counts charged illegal possession for sale of certain narcotics and four counts charged the illegal sale of narcotics. All of the counts of the indictment alleged the acts committed to be in violation of §3719.20 R. C.

At the beginning of the trial, the State dismissed counts one and two and the jury found the defendant not guilty as to counts seven and eight. Count No. 3 charged possession for sale of a narcotic drug, to-wit: marijuana, on February 8, 1958. Count No. 4 charged the sale of such narcotic drug on February 8, 1958. Count No. 5 charged possession for sale of a certain narcotic, to-wit: marijuana on February 14, 1958, and Count No. 6 charged the sale of a narcotic drug on February 14, 1958.

The errors claimed by the defendant are:

"1. That the defendant was deprived of a fair trial.

"2. The court erred in the admission of certain exhibits over the objection of the defendant which exhibits were prejudicial to the rights of the defendant.

"3. That the court erred in permitting certain evidence and testimony to be admitted, which evidence and testimony were prejudicial to the rights of the defendant.

"4. That the court erred in not giving the special charges and instructions to the jury as requested by the defendant.

"5. That the court erred in failing to include in its general charge to the jury certain instructions as requested by the defendant.

"6. That the court erred in refusing to sustain the defendant's challenge for cause of the panel of jurors called to hear the matter.

"7. That the court erred in refusing to dismiss the case upon motion of the defendant at the conclusion of the State's case.

"8. That the court erred in failing to dismiss the case upon motion of the defendant at the conclusion of all of the testimony and evidence.

"9. Other errors apparent on the face of the record which are prejudicial to the rights of the defendant."

The first claim of error is overruled because there is nothing in the record to support such claim. The defendant's brief makes certain charges about the conduct of the trial but the record is completely silent on the matters involved.

The second claim of error has to do with markings on paper envelopes admitted as exhibits on which one of the State's witnesses had made identification markings setting out the time and place and person (the defendant) from whom they were received. This claim seems inconsequential when the charge of the court referring to the exhibits is considered. It reads:

"I think the only caution I need to make in this matter is that certain writing on some of these exhibits which pertain to the elements of these charges. Those writings should not be considered in themselves as evidence or as proof of the establishment of the elements that I have referred to that are necessary for you to find to render your verdict in this case. But, the exhibits themselves and the contents of the exhibits are for you to consider under the instructions of the court, as evidence, together with the testimony which you have heard from the witness stand in this court."

Whatever error was committed in not removing the writing from the exhibits was rendered unimportant by the charge of the court which eliminated any possible prejudice. It is also claimed that error intervened by the receipt into evidence of certain photographs that showed police surveillance of the defendant while dealing with Williams at a time during a period between the dates of the several indictments. It happened that on this occasion the product sold to the police informer, while the police listened in, though represented to be marijuana, was sleeping tablets. This occurrence was the subject of testimony presented by the informer and also the defendant. If this testimony were considered by the jury as showing the defendant attempting to avoid the informer's request to get him marijuana (which was inferentially claimed) then this exhibit would benefit the defendant. However, if considered by the jury as showing the defendant's wilful deception of the police informer in one of the several transactions presented by evidence during the interval of time between the several indictments, then the State was entitled to this evidence. This claim of error is overruled.

The third claim of error deals with evidence of the arrests and con-

viction of the defendant brought upon the record during his cross-examination. The defendant does not clearly disclose the places in the record to which he refers. It appears from a reading of this part of the record that the defendant was questioned about statements made to the police about his arrests and his activity involving him in narcotic violations after his arrest for possession of a hypodermic needle in 1953. He admitted the arrests and that he was asked some questions concerning his activities in the sale of narcotics. He denied making the statements, about sales to certain named persons. After he had denied categorically each question read from a stenographic report, an objection was interposed. The objection was then too late. The questions had been asked for the purposes of testing the credibility of the defendant. In rebuttal competent evidence was received to the effect that such statements were made so that the basis for the examination was then properly laid. The third assignment of error is, therefore, overruled.

The fourth assignment of error was based on the refusal of the court to give two special instructions presented in writing for presentation to the jury before argument. These requests were as follows:

"1. I charge you that if you find from the evidence that there was a sale or a possession for sale of a narcotic and you find that the criminal intent to violate the law as to the possession for sale or sale, if there be such, originated in the mind of Lloyd Williams or the prosecuting authority and the accused was lured into the commission of an offense in order to prosecute him therefor, you shall return a verdict of not guilty."

"2. I charge you that if you find that the defendant was coerced or urged on by Lloyd Williams or the prosecuting authority to commit a crime and you find that the circumstances of the urging and/or coercion are strong enough to shift the origination of the crime from the mind of the defendant to that of the agent, Williams, you shall return a verdict of not guilty."

In the case of **State v. Barron, 170 Oh St 267**, N. E. 2d , (Ohio Bar January 25, 1960), the Supreme Court held in the syllabus:

"Under §2945.10 **(E) R. C.,** it is not mandatory upon a trial court to give any instructions to the jury in a criminal case before argument, but, if requested special instructions, reduced to writing, are correct, pertinent and timely presented, they must be included, at least in substance, in the general charge."

Request number two (on the subject of coercion), is clearly not a correct statement of the law. It should not have been given at any time unless there was evidence to support all the necessary elements of a correct statement of the law dealing with such defense. The court was not bound to give the substance of an incorrect request to charge to the jury in its general charge. **Felsman v. State, 45 Oh Ap 428, 187** N. E. 201. Also, State v. Barron, supra.

The defense of duress is defined in American Law Reports Annotated, 40 A. L. R. 2d 910, as follows:

"It has been stated generally that in order to constitute a defense to a criminal charge other than taking the life of an innocent person,

the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done."

The force which is claimed to have compelled criminal conduct against the will of the actor must be immediate and continuous and threaten grave danger to his person during all of the time the act is being committed. That is, it must be a dangerous force threatened "in praesenti." It must be a force threatening great bodily harm that remains constant in controlling the will of the unwilling participant while the act is being performed and from which he cannot then withdraw in safety. Fear of future harm cannot be the basis of such a defense.

In the instant case, the acts which constituted the crimes for which the defendant was indicted took place over a period of more than two weeks during which time the defendant was, for the most part, completely free from any possible domination by Williams. During this whole period, the defendant could have remained free from any possible domination by not joining with Williams or by avoiding him when they met in the saloon or poolroom. Each time the defendant joined Williams, he did so of his own free will with full knowledge of what the purpose of Williams' requests would be. There is not a bit of evidence in the record upon which the court could be required to give a charge on duress.

Whether the court should have given the charge (No. 1) on entrapment requires an examination of the testimony to determine whether there is any evidence whatever that might, when considered in its most favorable light in support of defendant's claims, warrant the giving of an instruction by the court on the defense of entrapment.

The charge as requested, although not completely accurate, indicated the nature of the charge desired so that, the court, if there was any evidence that could be said to support the elements of entrapment, should have given a correct statement of the law on that subject, including the degree of proof required and upon whom the law placed the burden of proof.

The defendant, by his own testimony, for a considerable time prior to the date of the charges in the indictment, was a frequenter of a saloon (Idle-a-While-Bar in Columbus) and also a poolroom nearby where he played pool. He testified that he was a good player and usually won sums of money. Although married he lived with his mother, spending intervals of time with his girlfriend. He had been, by his own admission, a user of narcotics within six months of the date of his arrest under the charges here presented, and admitted some limited knowledge of a place or two where drugs could be purchased. At least, he took the police informer to a place where the evidence tended to show that purchases of drugs were made. These are the alleged purchases set out in counts three, four, five and six of the indictment.

The State's witness (Williams) was unquestionably a police informer, was furnished funds by the police to make purchases of narcotics, and his activities in this case were to furnish the defendant the opportunity to sell narcotics. Whether his conduct, as shown by the evidence, was

sufficient to present an issue of entrapment is the question to be decided. The first contact between Williams and the defendant, at which time Williams requested the defendant to make a narcotic "buy" was explained by the defendant as hereafter quoted. There is no evidence of a close relationship between Williams and the defendant prior to their meeting in the saloon or in the poolroom sometime in early January or February 1958. They had gone to the same school, but were in different grades. The defendant claims no other close association at any time. They had also seen each other at the Y. M. C. A. "just playing basketball."

The defendant testified, in part, that he met Williams at the Idle-a-While Bar, was invited to have a drink or two, played pool for money, in which games the defendant usually was the winner. This went on once or twice a week for two or three weeks, when, on or about the first or second of January, according to the testimony of defendant, the following occurred:

"A. He asked me did I know a fellow by the name of Little Jackson, and I told him—I asked him who, and he said Little Jackson, and I said I knowed him—that I knowed him when I seen him, and he asked me did I want a drink.

"Q. I didn't hear that. He asked you what?

"A. He asked me did I want a drink, did I care for a drink, and I said yes. And we was standing at the bar, and he ordered a drink and paid for them, and then he told me that Jackson had took some money from him for some marijuana, and he was looking for him. And I told him I hadn't seen him. He asked me did I know where he could get some, and I told him that I know a fellow that might have some, and he asked be could he get a $5.00 bag, and I told him I didn't know, but I believe he could. And so, he pulled out his money, and I says, 'you might as well get a $10.00 bag,' and I handed him the $5.00 back, and he gave me $10.00. So, I told him to meet me at the Trocaveria downstairs, and I left the Idle-A-While Bar and went to 17th and Mount Vernon down to this drugstore, and attempted to purchase some boneset tea, and they didn't have any. So then I left there and I went to Mars, between 20th and Miami, and I asked the lady for some boneset tea, and she sold me a bottle, and I left there, and on the right side of the street, I started back there towards the Idle-A-While, and I stopped in a cafe.

"Q. You stopped where?

"A. I stopped in a cafe, Rosie's Cafe, I think the name of it is. And I went in the men's room, and I took a hand paper towel and poured out the boneset tea in it, and I wrapped it up and went back down to the Trocaveria and met Williams, and I give it to him.
"* * *

"The Witness: The next day around noon, I left my girl friend's house, and I started down towards the poolroom, and I got as far as the Idle-A-While Bar, and I can't be sure, but I think he had just pulled up and parked him and two fellows were together, and when I seen him, 1 started across the street towards the poolroom going north, and—

"Q. Now, wait a minute. He was parked on what side, the south or north side?

"* * *

"A. I started to go across, going to the poolroom, and he called me, and I went to see what he wanted, and he asked me for his money back, and I said, 'For what?' He said, 'You sold me some boneset tea.' and I said, 'How do you know I sold you some boneset tea?' And he said, 'Because the people downtown told him I had sold him some boneset tea.' And I said I didn't have any money, and you will have to wait until I get some money. He said, 'Get in the car.' And I says, 'For what?' And then he put his hand up there and I seen a pistol and I know he had said he had a shoulder holster, but I don't know if he had it on him or not. But he said, 'Get in the car,' just like that. And I said, 'O. K., then.' And then he started around the back of the car, and at the same time I was on the south side of the car, and I put my hand on the handle of it, like I was going to get in it, and when he put his hand on the handle on the driver's side to get in, just as he opened up the door, I ran. And when I ran, I turned the corner, and a car—when I got ready to go across the street, a car hit me on my leg. It didn't stop me, though, and I kept running. It knocked my hat off. And I run up the alley, and just as I was turning to go in the alley I could see Williams—I had taken about eight steps in the alley, and he told me to stop or he would blow my brains out.

"Q. And where was he at that time?

"A. He was right behind me. He was about, I will say, six feet behind me.

"Q. Chasing you?

"A. Yes.

"Q. All right. Go ahead.

"A. And he had his pistol out, and he had it pointing at me, and he says, 'Stop, or I will blow your brains out.' Of course, then I stopped, and I told him, I said, 'Well, you don't have to shoot me,' I says, 'I will take you home and see if I can get the money for you.' And so he said, 'O. K.' And so I started up the alley, and I asked him—I asked him to put the gun away, because he didn't need it, and he said it didn't make no difference about him having a gun, because he wasn't worried about the police, and I said, 'Well, O. K.' And going on the way up to my house, he started telling me about this fellow Jackson. He said when he seen Jackson he wouldn't ask him no questions, he was going to shoot him if he didn't have—get the money. So, I told him he didn't have to do that to me, because I would get him the money. So, when we got up to my girlfriend's house I started in, and he started in with me, and I told him I would appreciate it if he would wait there in the hall, because I didn't want her to know nothing about it. So, he said, 'O. K.' And he took his pistol back and put it down in his pants, like this, and held it. And so, I went in and got $3.00 I had in the drawer, and, well, I told her about it—I didn't tell her about the pistol and all that happened. So, I come back out, and we sat out on the porch, and I told him that is all the money I had, but I would get him the rest of the money, and he said he didn't care about the money,

what he wanted was some marijuana, and I said why, I didn't have any, and he said, 'Well, I will tell you what,' he said, 'you find out who has some marijuana, and get it, or just find out who has some marijuana.' And I said if I could, and I said to him that I would definitely pay him his money at the end of the week. And so he said, 'O. K.,' he said, but to buy him some marijuana, and he didn't want no stuff out of me. So I left."

After the foregoing experience, the defendant testified he saw Williams three or four days later at the Idle-A-While Bar (by appointment) where he asked, "had I got him any marijuana and I told him I hadn't" and after some conversation about paying back the money because of the "boneset tea," the defendant having just won six dollars at pool, they agreed to meet the next day. At this meeting, the defendant told him he had heard from the fellows that "McCants" had some marijuana so he took Williams out to McCants' home but McCants was not there. The defendant then testified, "I said, 'I suppose we could go around and ask different people.' And so we did that and we still didn't get any." The defendant testified that on the next day he offered Williams "some money" but "he did not want the money."

He further testified that around the 8th of February, 1958, the following took place:

"Q. What happened on that occasion?

"A. Well, I had seen him earlier, and he had asked me about some heroin, and I told him I didn't have any, and he had asked me about two fellows on the corner, had they—did they have any, and I told him no, and he said, 'Go and see.' And so I did. I went and asked the fellows, and me and this fellow went to the store and bought some Dormin sleeping tablets—Dormin sleeping capsules, and so we wrapped them up, and I was supposed to meet him, and I met him, and sold them to him.

"Q. That is the sleeping pills?

"A. Yes, sir.

"Q. All right. Now, when did you make your first trip with him out to Sam McCants'—or did you make a trip out there?

"A. Yes, sir, I made a trip.

"Q. Tell the jury what happened on that particular occasion?

"A. Well I was at the poolroom shooting pool, and he come in, and he called me then, and I said I was busy, and he said, 'Come on out here now; anyhow, I want to speak to you on some business.' So, I hung my pool stick up, and he said, 'Let's go back out to McCants' house.' And I says I didn't have any money, and he said, 'Don't worry about that. Get on in the car. I got the money.' So, I said, 'Well, what are we going out there for?' And he said, 'I got to get me some marijuana.' So, he put his hand in his pocket, the one with his pistol in, and I got in the car without any other questions.

"Q. Then what happened?

"A. So, we went out to McCants' house, and he told me to go in and see if McCants had any marijuana first. So, I went into McCants' house and asked McCants did he have any marijuana and he said yes,

and so I come back out to the car, to the driver's side, which he was driving, and told him that the man said he did have some marijuana. So, at the same time, this man come out of the house, and he—I told him—I told Lloyd that he said it would be $10.00. So, at the same time, the man come out of the house, and he give me $10.00, and told me to go get the marijuana. So, I took the $10.00 then and handed it to Mr. McCants, and McCants handed me a bag, and when I got it, I give it to Lloyd, and he told me to get back in the car, and he brought me back down to the poolroom."

He testified to an almost identical experience which occurred about the 14th of February, the one just quoted taking place about the 8th of February, both instances being the basis of the charges contained in the indictment in counts three, four, five, and six.

On redirect examination, in explaining why he sold Williams sleeping pills, the defendant testified:

"Q. Why did you try to palm off these sleeping pills on him?

"A. Because I just got kind of tired of him asking me to get some—

"Q. I didn't hear that.

"A. Because I got kind of tired of him asking me to get him some dope, and he had threatened me once."

There is not the slightest suggestion in the foregoing testimony or otherwise in the record that the defendant sold Williams boneset tea and sleeping pills to avoid purchasing or assisting in the purchase of narcotics. The sale of the boneset tea, as the defendant indicated, when he said, "How do you know I sold you boneset tea?" was shown by his own testimony to have been purposely done to take advantage of Williams, thinking he would not know the difference. His readiness to return the money (if he could get any) clearly supports this position. He did not, in his lengthy explanation, even suggest any other intention than to make money the easy way as was his then means of self-support.

His testimony in a number of places suggests that he acted in fear because of the many references to the "gun" said to have been carried by Williams. Such references could have application only to a claim of duress and could have no application in support of a claim of entrapment.

There is not a word of evidence that Williams had a gun after the day the defendant tricked him out of ten dollars by delivering boneset tea on the first occasion Williams attempted to buy narcotics. Many times the defendant said that he (Williams) put his hand in his pocket where he had his gun and remarks of like import without the slightest verification that there was a gun in Williams' pocket. But even if this were so, that is, that Williams had a gun, such evidence would have no probative force in attempting to support a claim of entrapment. Guns might be used in an attempt to force another to commit a crime but, if so accomplished, it would be duress and not entrapment.

The testimony of the first attempt to buy or procure narcotics by Williams from the defendant refutes completely any claim of entrapment. The defendant said: "He asked me did I know where he could get some (Marijuana) and I told him that I know a fellow that might

have some, and he asked me could he get a $5.00 bag, and I told him I didn't know, but I believed I could. And so, he pulled out his money and I says 'you might as well get a $10.00 bag,' and I handed him the $5.00 back and he gave me $10.00." Certainly no attempt to persuade the defendant to do anything he was not then prepared or willing to do is evidenced by this transaction. The defendant promptly brought back boneset tea and represented it to be marijuana, keeping in mind that the parties were just bar room acquaintances with some knowledge of each other as kids in school. Based on these facts, it would be more logical to say that Williams was the one being taken in. The defendant's conduct in the next attempt by Williams to get marijuana from him, after the altercation on the day following the boneset tea incident (in which the defendant was surprised to know that Williams had learned of the deception and inquired how Williams knew he had been tricked) was, according to the defendant's testimony, three or four days later. On this occasion, Williams asked "had I got him some marijuana" and upon being told, "no" some conversation was had about paying the money back that the defendant had taken from Williams in the boneset tea transaction. They agreed to meet the next day. The next day the record shows that they met as agreed (the defendant was on hand, negating any possibility of duress) and after the question "had he (the defendant) found anything" the answer was, "I told him I had heard through another fellow that McCants had some marijuana." At no time did the defendant resist or protest or hesitate in taking part in Williams' quest for dope. His efforts were not enlisted because of friendship, promises of financial gain or any other inducement other than the payment of whatever the defendant asked for whatever dope he might produce. Nothing was done by Williams that even suggested entrapment. All Williams did was to ask the defendant to get him some marijuana, thus affording him (the defendant) the opportunity to traffic in narcotics.

Crimes such as trafficking in narcotics are made difficult to detect because of the secrecy in which such traffic is carried on. Trafficking in the illegal sale of narcotics is one of the most insidious acts against the social order known to man. The number of lives destroyed by the use of drugs, instigated by those who unlawfully seek to make narcotics available to the unfortunate at huge profits are increasing because of the failure of law enforcing agencies to provide the processes by which the illegal distribution of drugs can be detected and prosecuted. As was said by the author of "The Defense of Entrapment and Related Problems in Criminal Law."—Vol. XXVIII, No. 3, Autumn 1959, Fordham Law Review, page 405:

"There are only so many weapons in the arsenal of the prosecutor, yet, in the face of statistics, both state and federal indicating a continuous and general rise in the rate of crime, there is an increasing tendency to take away or limit these weapons."

This article quotes Judge Learned Hand as suggesting that the entrapment of a criminal by officially instigated activities may be excused where there is either "an existing course of similar criminal conduct" or "an already formed design" or "ready complaisance." Surely

upon the record of this case, the defendant's conduct fits under the last classification. And on page 402 of the article just referred to, the author says:

"Many laymen, and even some lawyers, are under the impression that the way to abolish crime is to pass a law. This prevailing fallacy is illustrated by the enormous problem that police and federal agents encounter in enforcing laws against narcotics, gambling and prostitution—to mention only three. If these laws are to be enforced at all, the enforcement agencies must resort to informers and undercover agents. The problem is not solved by asserting that evidence so obtained comes from a polluted source and must be proscribed.

"It is safe to say that ninety-five per cent of all federal narcotic cases are obtained as the result of the work of informers, whether they be paid or not. Narcotics agents (who are well-trained and of a high calibre) can uncover large syndicates selling narcotics only through informers and undercover agents who can 'tip them off' as to peddlers and pushers. The latter, in turn, lead the agents to the wholesalers and importers.

"It is impossible for a policeman or a narcotics agent, even though not in uniform, to make contact with the underworld and make a 'buy' without using an informer or undercover agent as a decoy. A narcotics pusher, retailer or wholesaler, without this kind of stratagem, would no more sell to any one of the approximately 285 federal narcotics agents in this country than he would be foolish enough to sell directly to a police commissioner. The federal experience has been that normal victims of narcotic addiction are, by and large, a very poor class of people who can usually be recognized as addicts. An informer may pose as an adict or as a dealer in narcotics. Federal narcotic arrests are generally based on an original introduction by an informer to either a user or supplier and are usually made only after two or more sales. In the supplier cases, the agent's purpose is properly to endeavor to probe to the source of supply, and not merely to arrest the one making the delivery."

The American Law Institute at its Annual Meeting, after a meeting held May 21, 1959, where it was proposed that the Model Penal Code concerning entrapment be amended as set out below, was not accepted and a more liberal rule agreed upon. The following is quoted from page 415 of the Fordham Law Review, supra, as follows:

"This proposed section, as recommended by the Council, would read as follows:

"(1) A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense he solicits, encourages or otherwise induces another person to engage in conduct constituting such offense when he is not then otherwise disposed to do so.

"The Annual Meeting of the Institute rejected this view, however, and adopted instead an alternative formulation of subsection (1) which represents the minority view expressed in Sorrells and Sherman:

"(1) A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose

of obtaining evidence of the commission of an offense, he solicits or encourages another person to engage in conduct constituting such offense by either:

"(a) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

"(b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it."

The defense of entrapment was not known at the common law and is not now recognized by the courts of England according to the author of the article above quoted. Where a defendant knowingly violates the Criminal Law to the injury of the public safety, health or morals, it is indeed a serious question whether he should be given immunity because of the conduct of an informer inducing the act.

It would seem that the extent of the danger to the public morals and safety because of the crime committed should be given consideration when the defendant seeks a legal excuse as a defense. The defense of duress has never been recognized in a case of homicide. A like result must be true in case of entrapment. In crimes where intent is not an element, that is, that the act prohibited as a crime is so dangerous, or harmful to the social order that the defendant is held guilty without establishing criminal intent, it seems that in these cases, the basis upon which the defense of entrapment is said to be founded cannot be justified. If a defendant is induced under facts that would constitute entrapment to knowingly sell liquor to a minor, who is to be protected by the law, the minor or the defendant? It would seem that where the crime committed is of such harmful character and the interests of the public are so deeply endangered, the criminal act should be punishable regardless of the state of mind of the actor and the defense of entrapment should under such circumstances, fall of its own weight. The statute under which this prosecution is based is one in which criminal intent is not an element of the crime. However, the cases now seem to hold that where the criminal act was at the sole instigation of the informer, then the public injury is not the direct result of the defendant's purpose and the defense of entrapment may be available if supported by sufficient evidence. But where only the opportunity to commit a criminal act is afforded the defendant by the conduct of the informer, and the tendencies of the defendant indicate clearly that he intends to disregard injury to the public good, and voluntarily accepts the opportunity afforded him to violate the law, particularly where the crime committed is one usually committed in secret and is of such a depraved character that the public must be protected, he should, under such facts, stand the consequences of his act. Law enforcing agencies should be allowed to defend society against crimes committed in secret with tools that are equal to the task and through channels that (limited, of course, by the defendant's constitutional rights) will stamp out such destructive conduct which cannot otherwise be properly controlled. The safety of the public is the primary consideration of all agencies of law enforcement. Evidence of entrapment, as claimed by the defendant in his

assignments of error, is completely lacking in the record of the trial in this case.

There is another reason why the defendant cannot claim entrapment under the facts of this case. Entrapment is an affirmative defense and one that the defendant must prove. It is in the nature of a confession and avoidance. Here the defendant denies that he either possessed for sale or sold narcotics. In several places in the record of his testimony, he categorically denied all of the charges set out in the four counts of the indictment upon which he was found guilty. It is axiomatic that he can claim no error on the two counts dismissed by the State and on the two counts on which he was found not guilty. The claim of duress or entrapment (both affirmative defenses) in the commission of the acts charged against him in counts three, four, five, and six, is not available to him when he denies that he committed such act. Such claims (entrapment or duress) are inconsistent with the claim that he neither had for sale or sold narcotics and where his theory of the case is that he is innocent of committing the acts charged, the court is bound to charge the jury only upon his theory of the case and not as to some defense with which his own claims are in direct conflict.

In the annotation to the case of Henderson v. United States, 237 Fed. 2d 169, in 61 A. L. R. 666, at page 677, the author says:

"To invoke the defense of entrapment, it must necessarily be assumed that the act charged as a public offense was committed and it has been held, or recognized, by strong intimation or necessary inference in a number of cases that the defense of entrapment is not available to a defendant who denies that he committed the offense charged."

This statement is followed by the citation of many authorities. None to the contrary are cited. On page 678, we find the following:

"A charge on the subject of entrapment is not authorized in a case where the defendant interposed no such defense, but specifically contended that he neither committed nor participated in the offense charged. Neumann v. State (1934), 116 Fla. 98, 156 So. 237.

"And in Rodriguez v. United States (1955, CA5 Tex) 227 F. 2d 912, a prosecution for selling or facilitating the transportation or concealment of heroin imported into the United States contrary to law, it was held that the trial court did not err in refusing defendant's motion or requested charge on entrapment, where the defendant denied the very acts upon which the prosecution and the defense were necessarily predicated. The court said: 'It is true that this defense may be raised even though the defendant pleads not guilty, but it "assumes that the act charged was committed," and where the defendant insists, as she did here, that she did not commit the acts charged, one of the bases of the defense is absent.' "

"Likewise in Eastman v. United States (1954, CA9 Ariz.), 212 F. 2d 320, a prosecution for the unlawful concealment and transportation of opium based on evidence of federal narcotics agents to whom defendants allegedly sold and delivered the opium, where error was assigned on the refusal of the trial court to instruct on entrapment, the appellate court was of the opinion that defendants took a very incon-

sistent position in this respect, inasmuch as they had maintained throughout that they did not commit the crime, and it logically followed that there could be no entrapment. It was said: 'The trial court understood this situation and very properly refused to inject into the case a question which could have no other result than to confuse.'"

We must conclude, therefore, that the court was entirely correct in refusing to give the charges requested by the defendant for the reason that there is no evidence to support the claim that duress or entrapment compelled or induced the defendant to commit the crimes charged against him. Such ruling was correct for the further reason that such defense was inconsistent with the defendant's theory of the case and not, therefore, available to him. Claims of error four and five, therefore, are overruled.

Assignment of error number six, concerning defendant's challenge for cause of the entire panel of jurors called to hear his case is overruled because the record is not sufficiently complete to properly present such claim. Also, we hold that errors seven and eight are not well taken and error number nine is overruled for the reason that the record is not sufficiently complete to show that the court did not fully comply with his statutory duties in empaneling the jury.

For the foregoing reasons, the judgment of the trial court is affirmed.

KOVACHY, J, concurs.
HURD, PJ, dissents.

## DISSENTING OPINION
By HURD, PJ.

I must respectfully dissent from the majority opinion because I am convinced, from an examination of the record, that prejudicial error intervened whereby defendant was prevented from having a fair trial on his plea of not guilty.

The majority opinion quotes five pages or more of typewritten testimony entirely out of context, which describes the events leading to the purchase by the defendant of boneset tea and Dormin sleeping tablets which have absolutely no relevancy to any count of the indictment. As will be observed later in this opinion, such purchases were subject to the fair and logical inference from all the evidence that they were made to resist the constant plaguing by the police employee endeavoring to have the defendant violate the law against dealing in narcotics. The facts in this case are most unusual and require an objective analysis.

The defendant admitted that he had been a user of heroin but had stopped using it a year or more before the time of the trial. He also admitted having used marijuana but had stopped using it some six to eight months prior to the time of the trial which commenced June 13th and ended June 18, 1958.

The evidence shows that all of the transactions referred to in the indictment concerned one Lloyd Williams, Jr., who was employed as a Special Agent by the Columbus Police Department. Williams and the

defendant had been acquainted since childhood, having attended school together. According to the testimony of the defendant, Williams began to make it a practice to seek out the company of the defendant, meeting him in the Idle-a-While Bar and other places where they played shuffleboard, drank and played pool together.

According to the testimony of the defendant, Williams approached him as though, he, Williams, was a user of narcotics and asked defendant if he knew where he could get heroin and marijuana. It may be observed at this point that one of defendant's witnesses testified that Williams actually was a user of narcotics. Good's testimony shows that he told Williams that he did not know any place where narcotics could be had. However, he put Williams off on one occasion by accepting the sum of $10.00, promising to purchase marijuana for him. Instead, he went to a drugstore and purchased some boneset tea, a harmless substance which can be purchased in a drugstore without a prescription, and which, of course, is not a narcotic. The boneset tea was sold to Good in a bottle the contents of which he placed in a paper towel and delivered to Williams. Williams took the contents of the package to the Columbus Police Department, where, upon examination, they discovered that it was not a narcotic and so informed Williams. Thereupon, Williams set out to find Good, having in his possession a .38 caliber police special gun. The next day, on his way to the Idle-a-While Bar, Good saw Williams with two other men standing near an automobile. As Good started to cross the street to go to the poolroom, Williams called him over to the automobile. Williams then told Good that he had sold him boneset tea instead of marijuana and ordered Good to get in the car with him. It was then that Good saw that Williams had the police gun and when Williams started to go around to the driver's side, Good pretended that he was going to get into the passenger's side but as he placed his hand on the door handle, he began to run. He ran across the street into an alley with Williams in close pursuit. When Williams was about six feet from Good, he pointed the police gun at him and ordered him to stop or he would shoot him. His words were "Stop or I will blow your brains out." Good then stopped and said "Well, you don't have to shoot me" and promised to return the money which he had taken ostensibly to buy marijuana. The most money that Good could give Williams at that time was $3.00, but he explained that he would get the rest of the money for him. However, Williams stated that he did not care about the money, but that what he wanted instead was some marijuana to which Good replied that he did not have any. Williams then said "Well, you find out who has some marijuana and get it or just find out who has some marijuana."

The record shows that Williams kept after Good to get him marijuana but Good finally, upon the constant urgings by Williams, told him that he had heard of a person by the name of McCants who had some marijuana. Williams kept insisting that he did not want his money back but wanted marijuana instead.

Upon another occasion when Williams asked Good about some heroin, he told him he did not have any but was requested by Williams to go and see somebody about getting some, which Good did. Good put

Williams off again and in company with one other person, went to a drugstore and bought some Dormin sleeping tablets or capsules wrapped them up and gave them to Williams for $20.00. Williams was again informed by the Police Department that the substance was not heroin or any other kind of narcotic but Dormin sleeping tablets which could be purchased at a drugstore without a prescription. Williams then insisted upon Good going with him to see McCants and when he said he did not have any money, Williams said "Don't worry about that, get on in the car, I got the money." Again Williams put his hand in his pocket, the one with the revolver, and Good got in the car because, as he testified, he was in fear of Williams because of his threats to shoot him.

Good's testimony shows throughout that he had no intention of getting or purchasing marijuana or heroin for Williams but constantly refused and put him off by buying the boneset tea and the Dormin sleeping tablets. The entire evidence produced by the defendant shows that Williams was the aggressor, attempting first to lure and entice and then entrap Good into committing a violation and when this failed, attempting to enforce his demands by the threat of the police pistol. There is corroboration of this testimony by one, Esbe Owens, Jr., also a schoolmate of the other two, who testified to seeing Williams chase Good with the police gun and heard Williams say to Good "Take another move and I will shoot you" and that he heard Williams say to Good "He would let him make up the money in some other way." Good was, therefore, placed in fear of Williams, and it was under these circumstances that he accompanied Williams to the home of one, Sam McCants. This incident was conducted in such a manner as to tend to incriminate Good. Williams insisted upon letting Good act as the intermediary, placing the money in the hands of Good, and having Good pass the money to McCants, and then letting McCants hand the package purporting to contain marijuana, to Good, who then placed it in the hands of Williams.

There is no doubt from the testimony of Good concerning this transaction that the amount of money which Williams handed to Good was immediately handed to McCants. Therefore, it is evident that Good was not profiting from that transaction but was merely acting as an intermediary for Williams upon Williams' insistence that he do so. As before indicated, Good claims he was acting in fear of Williams who had threatened him with the police gun whenever Good resisted Williams' demands that he procure marijuana for him. A fair inference from the evidence presented by Good was such that the urging and coercion was strong enough to shift the origination of the crime from the mind of Good to that of Williams because of the ever present threat of bodily harm by use of the police pistol. The jury could readily find, if they believed the testimony of Good and his corroborating witness, that Good was in grave danger of bodily harm, and that the threat remained constant at the time of the incidents referred to in the evidence.

There can be no doubt that Williams was working for the Columbus Police Department because when Good sought to put off the threats and demands of Williams by selling to him the harmless boneset tea

and Dormin sleeping tablets, they were examined by the Police Department, and Williams was informed that he had been deceived by Good concerning the sale of these substances, which are not in the category of narcotics.

Esbe Owens, Jr., in corroboration of the testimony of Good, testified to the effect that Williams exhibited to him the boneset tea and stated that he got it from Ronald Good, for which he gave him $20.00 and that he was looking for him. This, according to Owens' testimony, was witnessed by him on the day that Good was coming down the street and Williams chased him with the pistol as hereinbefore set forth.

Considering the testimony of Good and Owens together, the record indicates that Good told Williams that he could make up the money in some other way. According to Good's testimony, the way in which Williams insisted it be made up was to bring him to someone from whom he could purchase marijuana, which resulted in Good taking him to see Sam McCants.

This evidence, presented by Good with corroboration disclosed a situation in which there was an affirmative defense of entrapment and coercion. Thus, according to Good's testimony, the criminal intent originated in the minds of the entrappers, in this case, Williams, the agent of the Columbus Police Department plus the officers and members of such department, for whom he was working.

It may be argued that Good deceived Williams by purchasing boneset tea and Dormin sleeping tablets. However, he was not indicted for obtaining money under false pretenses but for a violation of laws against dealing in narcotics. If in these matters he had sold narcotics to Williams, such as heroin or marijuana, instead of boneset tea and sleeping tablets, he would still be entitled to show affirmatively that his actions were caused by the entrapment by Williams or resulted from coercion by the use of a lethal weapon.

Of the nine assignments of error, the most important, in the opinion of the writer, involves the refusal of the court to charge on the question of entrapment. Counsel had requested two special charges as follows:

"(1) I charge you that if you find from the evidence that there was a sale or a possession for sale of a narcotic and you find that the criminal intent to violate the law as to the possession for sale or sale, if there be such, originated in the mind of Lloyd Williams or the prosecuting authority and the accused was lured into the commission of an offense in order to prosecute him therefor, you shall return a verdict of not guilty."

"(2) I charge you that if you find that the defendant was coerced or urged on by Lloyd Williams or the prosecuting authority to commit a crime and you find that the circumstances of the urging and/or coercion are strong enough to shift the origination of the crime from the mind of the defendant to that of the agent, Williams, you shall return a verdict of not guilty."

It is not error for the trial court to refuse to give special charges before argument in a criminal case although it is error prejudicial to the rights of the defendant if the court refuses to give the substance

of such charges in its general charge, if requested so to do, when the issue is raised by the evidence presented by the defendant, and if the charges are correct.

In **State v. Barron, 170 Oh St 267** (decided January 20, 1960), Ohio Bar, January 25, 1960, it was so held, as set forth in the syllabus, as follows:

"Under §2945.10 (E) R. C., it is not mandatory upon a trial court to give any instructions to the jury in a criminal case before argument, but, if requested special instructions, reduced to writing, are correct, pertinent and timely presented, they must be included, at least in substance, in the general charge."

However, the court refused to give the substance of the charges concerning entrapment by trickery and coercion in its general charge upon request to do so although the court in its comment stated that there had been evidence of entrapment.

It has been held that entrapment is an affirmative defense and where it is raised by the evidence, it is the duty of the court to instruct the jury on the subject: In the instant case, defendant's evidence made out a strong case for entrapment and coercion by the use of the police special revolver by the employee of the Police Department, Williams, with which he threatened the defendant to obtain his compliance with his demand to procure the marijuana for him.

The subject of entrapment is well stated in **15 O. Jur. 2d, page 429, Sec. 245**, which reads, in part, as follows:

"The word 'entrapment' is sometimes used loosely to mean 'trapped,' 'caught,' 'apprehended,' or to mean that evidence was obtained of the commission of crime or of criminal practices by artifice. 'Entrapment,' as that word is used in the consideration of defenses to criminal prosecution, is improper inducement to commit a crime. The gist of the entrapment is that the entrapper instigated the offense and then incited the accused to commit it for the purpose of prosecution. Where the criminal intent originates in the mind of the entrapping person, and the accused is lured into the commission of the offense in order to prosecute him therefor, the general rule is that no conviction may be had, although the criminality of the act is not affected by any question of consent. If the defendant is urged on by a state agent to commit a crime, and the circumstances of the urging are strong enough to shift the origination of the crime from the mind of the defendant to that of the agent, the defense of entrapment is available to the defendant. When an officer has no grounds for suspicion and induces a person to commit a crime simply for the purpose of making an arrest, his conduct constitutes entrapment."

For supporting cases and authorities, see Morei v. United States, 127 F. 2d 827; 18 A. L. R. 146, 66 A. L. R. 478 and 86 A. L. R. 263; 33 A. L. R. 2d 883; **State v. Griffith (C. P.) 27 O. O. 307, 130 Oh Supp. 30; State v. Langdon, 52 O. O. 403, 67 Abs 187.**

In the instant case, the court not only refused to charge on the question of entrapment and coercion but also refused to permit counsel for the defendant to argue these questions to the jury.

In view of the proposition of law that entrapment by allurement and coercion are affirmative defenses, the court committed prejudicial error in not instructing the jury on these subjects upon request and in not permitting counsel to argue to the jury on these subjects. The State in this case cannot claim disassociation from the work of its informer and agent, it being quite clear that the informer, Williams, was acting under instructions of the Police Department although its members may not have known about every detail of his conduct toward the defendant.

A late and important case on this subject is Sherman v. United States, 356 U. S. 369, 2 L. Ed. 2d 848, decided May 19, 1958. In that case, the Supreme Court reversed a judgment of the United States Court of Appeals for the Second District and held that entrapment was established as a matter of law and petitioner's conviction was reversed. It was there stated in paragraph (a) of the syllabus:

"(a) Entrapment occurs only when the criminal conduct was 'the product of the creative activity' of law-enforcement officials."

Paragraph (e) of the syllabus states:

"(e) The Government cannot make such use of an informer and then claim disassociation through ignorance of the way in which he operated."

The court stated in paragraph (g) of the syllabus that it still adhered to the doctrine of the court's opinion in Sorrells v. United States, 287 U. S. 435, 77 L. Ed. 413. In the Sorrells case the court said, as appears by paragraph five of the syllabus:

"5. Entrapment is available as a defense under a plea of not guilty; it need not be set up by a special plea in bar."

And in paragraph six, it is stated:

"6. Evidence of entrapment in this case held such that it should have been submitted to the jury."

In the Sorrells case, the court reversed the Circuit Court of Appeals for the Fourth Circuit and although it was a case involving the National Prohibition Act, the principles therein set forth were reaffirmed in Sherman v. United States, supra. In the Sherman case, there is an exhaustive review of authorities in the Sorrells case. The Sherman case, like the instant case, involved the subject of narcotics.

The evidence in this case, as presented by the defense, does not present a case in which the criminal intent originated in the mind of the accused or where the accused was merely furnished the opportunity to violate the law. Just the converse is true. The evidence of defendant here presented is much stronger than a mere case of entrapment by luring or inducing the defendant to commit a crime. Here the evidence, as produced by the defendant, shows that the agent of the Police Department time and again threatened the defendant with the use of the police gun if he did not comply with his demands for narcotics. Under such circumstances, the defendant clearly was entitled to the requested charges of entrapment by allurement and coercion according to the substance of the requested charges. These were questions for the jury, under proper instructions from the court, according to all the case law on this subject, both State and Federal. Refusal of the

court to instruct on these subjects and refusal to permit counsel to argue on them constituted prejudicial error for which the cause should be reversed and remanded for further proceedings according to law.

The majority opinion states that the defendant categorically denied all the charges set out in the indictment upon which he was found guilty. A careful reading of the record shows that the defendant related the facts incident to the charges of sale and possession for sale of marijuana in each distance, and the facts, as related by him, do not constitute a denial of what happened and cannot be considered as inconsistent with his affirmative defense of entrapment by allurement and coercion. The gist of the majority opinion would seem to indicate that it was necessary for the defendant to confess that what he did was a crime whereas in law and fact, the elements of entrapment by allurement and coercion are entirely consistent with his narration of the facts. Consequently, this contention in the majority opinion is, in the opinion of this writer, without merit. If the defendant had denied the facts, then there would be some merit to this contention as set forth in the majority opinion.

The majority opinion also quotes, at great length, from an article in the Fordham Law Review, Volume XXVIII, No. 3, Autumn 1959, page 399, entitled, **Defense of Entrapment.** This is an excellent article but it has no bearing upon the issues of this case. Law Reviews serve a very useful purpose but they are not authoritative. As between articles written in Law Reviews and authoritative decisions of the Supreme Court of Ohio and the Supreme Court of the United States, the latter must take precedence.

Much space is given in the majority opinion to the evils of narcotic traffic, with which the writer is in complete accord, but which are irrelevant to the issues of this case.

Proceeding now to assignment of error number two, this assignment of error should be sustained for the reason that the court erred in the admission of certain photographs over the objections of defendant, which exhibits were prejudicial to the rights of the defendant. These photographs, Exhibits 5, 6, 7 and 8 are pictures of the police cars which were used to observe Good selling Dormin tablets to Williams. It is freely admitted that the defendant sold Williams some Dormin sleeping tablets under the pretense of there being heroin. Inasmuch as Dormin sleeping tablets can be purchased in a drugstore without a prescription, no violation of the narcotics law was involved nor was there any count in the indictment therefor.

The court in a statement said that he realized that the photographs pertained to a date other than the dates referred to in the indictment but that there was a **possible course of conduct or practice before or after the incident,** and that it was on this basis that the court admitted these photographs into evidence. This evidence could not possibly come under the statute relating to similar offenses, nor could the observance by the police of the sale of simple Dormin sleeping tablets to the police agent have any materiality or relevance to any offense charged in the indictment.

Any course of conduct of the police before or after the incident

of the sale of Dormin tablets could not possibly be binding upon the defendant. To permit such evidence to go to the jury, which did not involve any charge in the indictment, was highly prejudicial and could have no other effect than to prejudice the minds of the jury against the defendant.

There was error also in admitting into evidence envelopes on which Williams had made various notations, all concerning the contents, the names of the persons he claimed to have gotten them from, the time, the dates and what he did with them. Such writings should have been stricken from the envelopes before permitting them to go to the jury. Simply instructing the jury to disregard them was not sufficient to cure the error in view of all the other facts and circumstances of the case.

I agree with the majority opinion that none of the other assignments of error can be sustained on the ground that they were prejudicial to the rights of the defendant.

For the reasons set forth herein at length, it is my view that the judgment of the Court of Common Pleas should be reversed and the cause remanded for further proceedings according to law.