**STATE of Utah, Plaintiff and Respondent,**

v.

**Patry CURTIS, Defendant and Appellant.**

**No. 13879.**

Supreme Court of Utah.

Nov. 11, 1975.

Robert Van Sciver of Athay, Bown & Van Sciver, Salt Lake City, for defendant-appellant.

Vernon B. Romney, Atty. Gen., William W. Barrett, Asst. Atty. Gen., Salt Lake City, for plaintiff-respondent.

CROCKETT, Justice:

Patry Curtis was convicted in a trial to the court of distributing a controlled substance (amphetamine) for value.[1] In attacking his conviction, he makes no contention that he did not commit the acts charged, but argues that the court committed error: (a) In ruling on evidence; and (b) in refusing to rule as a matter of law that he was entrapped into committing the crime.

The following facts are stated in defendant's own brief: In March, 1974, Rose Ann Stout was working as an undercover agent. She made the acquaintance of defendant for the purpose of purchasing narcotics. She testified that her first "buy" of drugs from defendant occurred on April 8, 1974. Defendant, against his own interest testified that during March and April of 1974 he was continuously procuring drugs for Mrs. Stout for her personal use.

Defendant's brief further states that he: ". . . does not deny supplying Ms. Stout with amphetamines on June 18, 1974 [the transaction of which he was convicted] and on prior occasions. However, defendant testified that he never did so voluntari-

1. Sec. 58–37–8, U.C.A.1953.

ly but only at repeated urgings of Ms. Stout and never at any profit to himself."

### Ruling on Evidence

■ Defendant's contention is that the trial court erred in limiting the cross-examination of Ms. Stout relating to her "motives, credibility, and pattern of practice" in her activities as an undercover agent. This contention can be disposed of by these general observations: It is to be conceded that each of the factors just stated are legitimate subjects of cross-examination; and that particularly in a criminal trial, a relatively high degree of tolerance should be indulged in the making of such inquiries.[2] This is to be weighed against the opposing propositions: that to enable the trial judge to perform his duty as the authority in control of the trial, in the interests of effective and orderly procedure, he is allowed considerable latitude of discretion in imposing reasonable limits on cross-examination; and, further, that unless it appears that there was a clear abuse of discretion, resulting in prejudicial error, his ruling thereon will not be disturbed.[3]

■ Applying the principles just stated to the situation here: we do not see that defense counsel was unduly restricted. The evidence elicited and the discussions between court and counsel adequately explored defendant's claims with respect to the motives, credibility and methods of operation of the undercover agent so that there was no prejudicial error committed in the limitation placed on cross-examination.

### Entrapment

■ It is to be realized that most crimes are committed in such secrecy as can be achieved. This includes particularly trafficking in drugs, which is often carried on under such devious schemes that effective detection and prosecution are greatly aided by the use of undercover agents.[4] It is likewise true that where undercover agents are used, there always exists the possibility that unless their conduct is proper and circumspect, in attempting to catch those actually involved in unlawful activities, innocent persons may be induced into transgression. When this occurs, there is no doubt about the validity of the defense of entrapment. The doctrine arises because of recognition that as a matter of policy it is not a proper function of law enforcement officers, either themselves or by the use of decoys or undercover agents, to induce persons who otherwise would be law-abiding into the commission of crime. On the other hand, where it is known or suspected that a person is engaged in criminal activities, or is desiring to do so, it is not an entrapment to provide an opportunity for such person to carry out his criminal intentions.[5]

■ It is sometimes said that when it is shown that the accused actually committed the offense (as here), the claim of entrapment is an affirmative defense which must be proved by the evidence [6] somewhat analogous to the plea of confession and avoidance.[7] But it is also to be kept in mind that the burden of proving the defendant's guilt beyond a reasonable doubt is always upon the state: both initially and ultimately. Therefore, the only requirement on the defense of entrapment is that it be sufficient to raise a reasonable doubt that the defendant freely and voluntarily committed the crime.

2. See *State v. Anderson*, 27 Utah 2d 276, 495 P.2d 804; 62 A.L.R.2d 610.

3. *State v. Belwood*, 27 Utah 2d 214, 494 P.2d 519.

4. Legitimacy of such use, see *Sorrells v. U. S.*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413.

5. We regard this to be in harmony with the previous expressions of this court. See *State v. Perkins*, 19 Utah 2d 421, 432 P.2d 50, and

*State v. Pacheco*, 13 Utah 2d 148, 369 P.2d 494, and with our statutory definition 76–2–303, Subsection (1), U.C.A.1953 (Enacted in Ch. 196, S.L.U.1973), quoted in the dissent.

6. See 25 Am.Jur.2d 212 and cases therein cited.

7. See *State v. Good*, 110 Ohio App. 415, 165 N.E.2d 28.

■ Accordingly, when the problem of entrapment is present, the inquiry focuses upon two propositions: (1) Does it appear beyond a reasonable doubt that the crime was the product of the defendant's voluntary will and desire to commit it; or (2), Was the crime induced or motivated by the actions of the prosecution. If the evidence relating to the second proposition raises a reasonable doubt as to the first, then there can be no conviction of the crime.

■ The defendant expresses no direct controversion of the principles of law hereinabove stated. The gravamen of his attack upon the judgment is: "The trial court erred in not ruling as a matter of law that entrapment occurred . . ." His argument is based upon an assumption of facts as he contends them to be: that he was induced to supply Ms. Stout with drugs as a "favor" to her for reciprocal "favors" of sexual intimacy. The fact of significance here is that the testimony of Ms. Stout was to the contrary: that she had not extended to defendant any of the "favors" he claims; that from the beginning of their acquaintance he had told her that the way for a woman to make money was in prostitution and in drugs and had expressed a willingness to sell drugs. Under his version he appears to have been willing to accommodate her in both lines.

The procedure of waiving a jury and having a trial to the court was undoubtedly because the defense was aware that under the evidence to be adduced there was no realistic way to deny the commission of the offense charged; and that the only defense available was that of entrapment. That is, to make it appear from the evidence that there was a reasonable doubt that the defendant would have committed the crime except for the inducements of the undercover agent.

In his discussions giving consideration to this case the trial court clearly and correctly stated his understanding of the law in accordance with the principles we have discussed herein, including his view that under this conflicting evidence the problem of entrapment was a question of fact, which depended upon the credibility of the witnesses. In that regard, we make these brief comments: despite defendant's concession that "during March and April of 1974 he was continuously procuring drugs for Ms. Stout . . .," he urges that it is not shown that he was habitually selling drugs. Concerning his contention that he was providing the drugs merely to do "favors" for Ms. Stout: this might test the credulity of even the most trusting, when it is realized that in each transaction the drugs were sold for money; and that the price he exacted for the drugs in the transaction of which he was convicted was $100.

It is our opinion that the defendant has had what the law entitles him to, a fair trial with a presentation of the evidence in accordance with his request that this be done to the court instead of a jury. It appears that the trial judge gave full, careful and proper consideration to all aspects of this case in coming to his expressed conclusion; that he believed beyond a reasonable doubt that the defendant was guilty of the crime.

Affirmed. No costs awarded.

HENRIOD, C. J., and ELLETT, J., concur.

MAUGHAN, Justice (dissenting).

For the following reasons, I dissent.

Defendant appeals from the judgment of the trial court, sitting without a jury, convicting him of the crime of distribution of a controlled substance in violation of Section 58–37–8(1)(a)(ii), U.C.A.1953. Defendant seeks reversal of the judgment and a rule that he was entrapped, as a matter of law; or in the alternative a new trial.

Three points of error are advanced on appeal. They are:

(1) Limitation of the line of questioning on the motives, credibility, pattern and practice of Rose Ann Stout, in her capacity as an undercover agent.

(2) Failure of the trial court in not ruling, as a matter of law, that defendant was entrapped into committing the offense charged.

(3) When there is evidence that defendant is merely acting as a go-between in procuring drugs for an undercover agent, and no evidence that defendant was personally receiving any gain from the transaction, the defendant cannot be found guilty of distributing a controlled substance for value.

With regard to point No. 1, while there was considerable dialogue between the court and defense counsel concerning those matters which could be inquired into, when the time came for the cross-examination of the State's witnesses and the adducing of evidence through defendant and his witnesses, it is my conclusion that the trial court allowed considerable latitude to defense counsel in calling into question the motives, credibility, and the modus operandi of the undercover agent. It would appear from the transcript that defense counsel was successful to the point of establishing those matters about which the undercover agent had a failure of memory.

The principal issue on this appeal is raised in defendant's second assignment of error: Was there an entrapment?

Entrapment is a defense available to one accused of crime, when it is made to appear that the accused was induced to commit the alleged crime by an officer of the law, which crime would not have been committed, but for the inducement of such officer. When such a situation is shown, any conviction cannot be allowed to stand. The concept of entrapment, as a defense, developed as decisional law and has long been a . part of the law of Utah. Two Utah cases[1] correctly state the rationale upon which entrapment is grounded—that of government misconduct, not whether defendant was an unwary innocent or criminal, not whether there existed predisposition to commit crime. This rationale has since been made a part of our statutory law, and is to be found in 76–2–303, U.C.A.1953, enacted by Laws of Utah 1973, Chapter 196, Section 76–2–303. Section (1) of that statute is as follows:

(1) It is a defense that the actor was entrapped into committing the offense. Entrapment occurs when a law enforcement officer . . . induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

This statute adopts the "objective" test of entrapment, and is based upon the Model Penal Code of the American Law Institute; and their operative words are equivalent.[2]

Our statute goes on to deny entrapment, as a defense, where causing or threatening bodily injury is an element of the offense; allows the defense even though commission of the offense is denied; provides that the defendant, ten days before trial, may by motion have an entrapment hearing wherein the court shall determine, as a matter of fact and law, whether the defendant was entrapped. It further provides that, in any hearing before a judge or jury, where entrapment is an issue, the past offenses of the defendant shall not be admitted; except that in a trial where the defendant testified he may be asked of his past convictions for felonies and any testimony, which he may have given in an entrapment hearing, may be used to impeach his testimony, at trial.

1. *Salt Lake City v. Robinson*, 40 Utah 448, 125 P. 657 (1912) ; *State v. McCornish*, 59 Utah 58, 201 P. 637 (1921).

2. 10 U.L.A., Model Penal Code, Section 2.13 (1) (b), p. 476. An illuminating discussion of the adoption of the objective test of entrapment by the American Law Institute is found in its Model Penal Code, Tentative Draft No. 9, May 1959 ; and its Proposed Official Draft, May 1962.

The law of entrapment has not been free from confusion. Subsequent to the Robinson and McCornish cases, this court, in *State v. Pacheco* and *State v. Perkins* [3] injected into the rationale of the defense of entrapment a concept which was a departure from Robinson and McCornish, and one which had been adopted by the Supreme Court of the United States in an opinion by Mr. Chief Justice Warren [4] wherein it was said:

> To determine whether entrapment has been established, a line must be drawn between a trap for the unwary innocent and a trap for the unwary criminal.

In that case the "subjective" view of entrapment was adopted, which view was followed in Pacheco and Perkins, and has since been expanded in another United States Supreme Court decision, *U. S. v. Russell*.[5] These cases following *Sorrells v. U. S.*[6] state that the "subjective" test (also known as the "innocence" test) is the underpinning for the defense of entrapment. This approach has been roundly criticized, not only in judicial opinions but by learned writers.[7] The "subjective" test carries with it the consideration of the accused's "predisposition" to commit the crime, as well as submission of the issue to the jury. Pacheco and Perkins have been overruled by the legislature.

This test, as was noted, was followed in our cases of Pacheco and Perkins, but has now been replaced with what is known as the "objective" test. This latter concept establishes entrapment on its historical basis, viz.: that of refusing to countenance a perversion of justice by government misconduct. In this test the determination of whether the government conduct falls short of standards, to which common feelings respond, is a question of law to be determined by the judge, not a subjective question for the jury. This test provides a solid, definitive standard upon which the defense can rest, viz.: Does the conduct of the government comport with a fair and honorable administration of justice? [8]

The defense does not deny the police the use of decoys to afford a person an opportunity to commit a crime; but it does deny the use of decoys to actively present inducements for the purpose of luring a person into the commission of an offense. The manufacture of crime is not a legitimate enterprise in which the government is permitted to engage. The prime duty of the government's law enforcement agencies is the prevention of crime through the apprehension of those anti-social persons who, without inducement, are engaged in the commission of crime.

This defense is not available to one who is induced, by a private person, to commit crime. Only when one is induced to commit crime, by a government agent, can entrapment be interposed, it can thus be seen that the focus of the defense catches only the view of the conduct of the government. This is precisely the rationale expounded in Robinson and McCornish, and that enacted by the legislature, in 76–2–303.

It is the conduct of government law enforcement which raises or lowers it in the esteem of the society. The desire, to improve law enforcement, to enhance the esteem with which law enforcement should be regarded, together with the refusal of the courts to countenance foul means to

3. 13 Utah 2d 148, 369 P.2d 494 (1962), and 19 Utah 2d 421, 432 P.2d 50 (1967), respectively.

4. *Sherman v. U. S.*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

5. 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

6. 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249 (1932).

7. Mikell, The Doctrine of Entrapment in the Federal Courts, 90 U.Pa.L.Rev. 245; Donnelly, Judicial Control of Informants, Spies, Stoolpigeons, and Agent Provocateurs, 60 Yale Law Journal, 1092, 1098–1115; Note Entrapment by Government Officials, 28 Columbia Review 1067.

8. Able discussions of these views are also found in Notre Dame Lawyer, Vol. 49, No. 3, p. 579, February 1974; Minnesota Law Review, Vol. 58, No. 2, p. 375, December 1973.

achieve a result, gave birth to the defense of entrapment. The rule of law depends upon the confidence the society has in its agencies to honestly, fairly, and honorably enforce it.

The facts generating defendant's defense of entrapment are these:

Beginning in the latter part of February, or the first part of March of 1974, Rose Ann Stout, a paid female undercover agent, at the request of the police, began directing her attention to defendant. Stout worked as a cocktail waitress. She met defendant in a motel. Through the months of March, April, May, and up to the time of defendant's arrest, viz.: June 18, 1974, the undercover agent and defendant enjoyed a very close personal relationship. The record clearly shows that they spent a great many hours together in the coffee shop, and away from it. The record is clear that they were together almost continuously during the months of March and April, and less frequently during the months of May and June. That this relationship was personal and close is borne out by the record. Defendant testified to numerous sexual connections with the undercover agent during the months of March and April, and once in May. The undercover agent denies any sexual connection, but does admit to having been in defendant's room alone with him, and in his room with him and others, at other times. She also refers to a booth in the coffee shop as "our" booth.

Throughout this time the undercover agent was asking defendant for amphetamines, and her testimony is that the first delivery he made was on April 6th and the first "buy" April 8th. Thereafter, other deliveries were made, until the final one occurred at the time of defendant's arrest. Some of these meetings, between the undercover agent and defendant, were monitored and recorded by remote electronic equipment.

Two recorded telephone conversations are illustrative of both the close personal relationship between the undercover agent and defendant, and the inducement. On April 24th the undercover agent initiated a telephone call to defendant in the course of which she asked, "how many can Lynne get?"

Defendant: "Who?"

Undercover Agent: "You know, Lynne."

Defendant: "Oh, yeah."

Undercover Agent: "How many can you get?"

Defendant: "Two hundred."

Undercover Agent: "What price?"

Defendant: "Twenty. I don't deal in these things. I just get them for you, you know that, don't you?"

The undercover agent testified she recalled this conversation, and that she had asked defendant to supply her with pills. The recording of the conversation of June 17th, the night before the morning of the arrest, is as follows: The record relates the undercover agent called defendant and said, "Pat."

Defendant: "Who is this calling?"

Undercover Agent: "Rose Ann."

The record shows that his voice lifted and he said, "Hi, Sweetie."

Undercover Agent: "How much did you get?"

Defendant: "He's got five or seven hundred. I don't know which."

Undercover Agent: "Are you going to bring it?"

Defendant: "I will go by and pick it up and see you a little later."

Here we have a paid undercover agent, 24 years of age, initiating and sustaining a close personal relationship with defendant, a man of 47 years, for three and one-half months, during which time defendant on more than one occasion supplied the undercover agent with pills. There can be no question that the government through this undercover agent initiated a course of conduct to be followed, by its agent, to obtain evidence of the commission of a crime for prosecution of a selected defendant. The

instrumentality selected for the performance of this course of conduct, intrinsically, is one of the more powerful forms of inducement known to the human family. The use of such an instrumentality within the framework of the facts in the record certainly constitutes a method which, at the very least, creates a substantial risk that the offense would be committed by one not otherwise ready to commit it. Beyond any question, it goes far beyond merely affording a person an opportunity to commit an offense. Indeed, the undercover agent testified that the first delivery took place more than a month after the government had instigated the association. Had the defendant been ready to commit the crime, without inducement, the opportunity was certainly afforded him, during the first month of the association, in which no delivery was made. Here, the course of conduct constituting the inducement was all of a piece, and the resulting crime the product of the inducement. The sale for which defendant was arrested and convicted occurred after a series of sales. They were not the results of individual inducements.

The government, once employing an undercover agent, cannot choose to select those actions of the informer which are beneficial to its case, and refuse to be responsible for the total conduct of its agent while engaged in the deception. To say that the course of conduct of the government's agent in March, April, May is divorced from the conduct prompting the agent's solicitation, and the defendant's response, in June, is to seriously misjudge human nature. The course of conduct was as reprehensible in June as it was in April.

An example of such selectivity is shown by the testimony of the Director of the Region Four Narcotics Task Force, a Mr. Harper. When asked about "Miss Stout's dealings with Mr. Curtis," his reply was: "We weren't actively involved with Mr. Curtis throughout the month of March." Yet the agent of the task force was. Her activities were commenced, by direction, around the first of March. The State claims ignorance of its activities through the month of March, allowing the setup to take whatever form it would, without as much as an attempt to determine what its agent was doing. Apparently the State did not even question its agent during this initial period, for Mr. Harper said he had all the records, in court, of "those dealings." Then, later on, the State selects a "proper" time, in which it is "actively involved with Mr. Curtis," to make the arrest. The State cannot disassociate itself from the activities of its agent by claiming ignorance of the conduct of its agent. In enforcing the criminal law, the State must know the conduct in which it engages in order for it to determine whether it is manufacturing crime, or merely presenting an opportunity for its commission.

The trial court acknowledged that the character of the government's conduct lends itself to entrapment, but concluded that a hiatus in sexual favors for two months broke the chain of causation. To inject the chain of causation element, the court assumed the testimony of defendant relating to the sexual association to be true —defendant placed the last sexual connection in the middle of May, thus only a month of, no sexual activity would have expired. Be that as it may, the record discloses no State evidence to indicate an entrapment was not intended, and no evidence to show that a mere opportunity to commit crime was offered defendant. The record does show, from the State's own witnesses (it is not necessary to consider defendant's), that defendant was the target of the undercover agent; that an association with defendant was directed to be initiated by such agent; that the association endured for three and one-half months; that during that time the agent spent "hours" with defendant—in the coffee shop, in defendant's hotel room, alone with him, and with him and others; that the booth at the coffee shop was "our" booth; that more than a month ensued, after the initiation of the association, be-

fore defendant delivered any pills to the agent; that she asked defendant to supply her with pills.

The time frame within which the initiated inducement is to be analyzed is that within which the total activities took place. In *Grossman v. Alaska*[9] that court, without benefit of statute, judicially declared the objective test and said:

> In applying the objective test we do not mean that the course of conduct between the officer and the defendant should be ignored. The transactions leading up to the offense, the interaction between the officer and the defendant and the defendant's response to the inducements of the officer are all to be considered in judging what the effect of the officer's conduct would be on a normal person.
>
> In short, we do not intend that entrapment should become a ready escape hatch for those who are engaged in a course of ciminal enterprise. But, under standards of civilized justice, there must be some control on the kind of police conduct which can be permitted in the manufacture of crime.

Within the time-frame element of entrapment, which necessarily must be considered by the court, in determining the issue of entrapment: the case of *Wall v. United States*[10] presents an interesting example. There a paid female informer was an erstwhile mistress of defendant. She had known defendant for a number of years and had lived with him as his mistress, intermittently, for four or five years. She was a drug addict, and while no longer occupying her former common law status, she contacted defendant, introduced her then companion as her husband, and importuned defendant to secure narcotics for her. Under these circumstances the court held that defendant was entitled to present his defense of entrapment. In reversing, the court said:

> . . . on the other hand, if they took advantage of the sympathy appellant

would naturally have for Isabel Knowles because of their former illicit intimate relations and thereby induced appellant to put the agents in touch with Zarata to pander to her craving for morphine, and he was acting solely in the belief that by doing so he would alleviate her suffering, and he was not in any other way interested in the unlawful sale, this would amount to entrapment, and the conviction could not be sustained.

There is no evidence that defendant was trafficking in drugs, other than the commission of the offenses heretofore stated, and the only evidence offered to justify the initiation of the course of conduct resulting in defendant's arrest for selling a controlled substance is a statement by the undercover agent, "I had been told he had been dealing in drugs, and that was my initial reason for getting to know him . . ." After which, she continued knowing him for three and one-half months—hardly just the offer of an opportunity to commit crime. Indeed, the record discloses only two cold check charges against defendant, of some 25 years ago.

The defense of entrapment is made, not from defendant's testimony, but from the evidence adduced by the State, and the statements of its star witness, the undercover agent.

Defendant is not less guilty of the commission of the offense because of the entrapment. He indulged in conduct proscribed by statute and is thus guilty of a crime; but his conviction cannot stand, for the reason that the statute condemns, and this court should condemn, the State's conduct which procured the crime, as a perversion of the proper standards of administration of the criminal law.

Law enforcement is not in need of courses of conduct such as the one exposed here. The State's evidence proves a sale of a controlled substance; it also proves the defense of entrapment. It is not necessary to reach defendant's third assignment of error.

---

9. 457 P.2d 226, 230 (Alaska 1969).

10. 65 F.2d 993 (5 Cir. 1933).

The conviction of defendant should be reversed and this matter remanded with instructions to discharge defendant, and exonerate his bond; or if such is on deposit, refund the same.

TUCKETT, J., does not participate herein.