The STATE of Utah, Plaintiff and Appellant,

v.

Shane BRIDWELL, Defendant and Respondent.

No. 14783.

Supreme Court of Utah.

June 28, 1977.

Vernon B. Romney, Atty. Gen., R. Paul VanDam, Salt Lake County Atty., Charles D. Marson, Deputy Salt Lake County Atty., Salt Lake City, for plaintiff and appellant.

Kathryn Collard, Salt Lake City, for defendant and respondent.

ELLETT, Chief Justice:

The State appeals from a pretrial dismissal of the case against Shane Bridwell, wherein he was charged with the offense of "unlawful distribution for value of a controlled substance" (marijuana). The court held that the respondent was entrapped and in doing so stated:

Now, the question is: Suppose—suppose we take all of the testimony in dispute and view it in the *light most favorable to this case going on trial* this afternoon; that is, assume that the defendant was selling to somebody immediately previous to this sale. Assume that Charles England and Mike George both witnessed that, and assume that immediately following that sale, then, the defendant was involved in the sale to Mike George and/or Charles England. Assuming all of those things, we still have to take into consideration that the defendant is not charged with that offense, he is not charged with that sale; he is charged with this sale.

And suppose that that sale was totally voluntary on his part, the other sale; suppose that was part of a long history of dealing that he was involved in.

The question is not whether that justifies an entrapment situation here, if such be the case, but whether this situation came about by one who was willing under the circumstances to get involved in this situation, or whether, in fact, it was induced, or that there was a substantial risk that it was induced, by a friendship relationship between Charles England and the defendant. [Emphasis added.]

Now let us consider the evidence which when looked at "in the light most favorable to the case going on trial" would justify the trial court in ruling as it did. The trial judge further stated:

This is not an easy type of case. It is not easy for the law enforcement people who are *out there trying to take care of the types of things that the people, the citizens of this community, are demanding that they take care of, and doing it the best way they can,* putting together a case the best they can. And in this narcotics area, that is not easy. It's not easy.

I think it's very clear that, you know, it's not like a person who is dealing in narcotics goes out and solicits his wares, solicits purchases in the community like other merchants do; I mean, these are covert operations. And so the police and the sheriff use covert methods in order to attempt to bring these things to a halt. [Emphasis added.]

The officer who was "out there trying to take care of the types of things that the people, the citizens of this community, are demanding that they take care of, and doing it the best way they can" did the best way he knew. He testified that he first went to Shane Bridwell's home on November 21, 1975, and there he asked if Bridwell could arrange to get a "lid" (jargan meaning a can of marijuana). Bridwell told the officer to come back in three days and he should have some pounds by then.

Three days later the officer and Mr. England, the contact man, returned. Both of them testified that they were told to sit on the couch and shortly afterwards, Mr. Bridwell sold a pound of marijuana to a man named Brown who paid cash for it. In a few moments Mr. Bridwell brought a second pound of marijuana from out of the kitchen and gave it to the officer who paid him $130. Mr. England had gone into the kitchen with Mr. Bridwell and testified that the closet from which the marijuana was taken contained five or six other pound-bags of marijuana.

The reason for attempting to buy marijuana from Mr. Bridwell was because the

sheriff's office had received a lot of calls that Bridwell was dealing heavily in the Kearns area (where he lived) and that surveillance of his residence showed a lot of traffic in and out of the home.

Mr. England was in some sort of trouble with the law and agreed to help the officers for some consideration on their part. He had known Mr. Bridwell since they were in junior high school, and it was thought that he could be the contact man to introduce the officer to Mr. Bridwell.

Mr. Bridwell and his wife testified that England asked for the marijuana and Bridwell got it as an accommodation, selling it for the exact cost. If their testimony has to be believed, then one could find that the particular sale was induced by the conduct of England and the officer. It is difficult for us to believe that a jury would, on hearing the testimony, come to the same conclusion as did the trial judge about the matter.

The law applicable to this case is set out in *State v. Curtis*[1] and need not be repeated here.

One dealing heavily in drugs as was Mr. Bridwell would naturally be expected to be careful and reluctant to sell to anyone who did not come properly recommended to him. That disarming recommendation was given by Mr. England and the respondent was caught—not entrapped. The best that can be said for Mr. Bridwell is that there is a jury question involved in the matter.

The ruling of the trial court is reversed and the case remanded with directions to proceed with the trial thereof.

CROCKETT, J., concurs.

HALL, J., concurs in result.

MAUGHAN, Justice (dissenting):

Before us is a judgment of the trial court rendered after an entrapment hearing. The court found entrapment and dismissed the case. We should affirm. All references are to U.C.A.1953, unless otherwise noted.

The State specifically appealed to this court for guidance in the proper interpretation of Sec. 76–2–303(1), U.C.A.1953, as enacted 1973. The majority opinion does not specifically and directly respond to this plea.

The trial judge ruled that under this new enactment, the legislature had elected to follow the "objective theory" of entrapment. Under this concept the character of disposition of the defendant is irrelevant; the crucial issue is an evaluation of the police conduct, viz, did the state employ impermissible deceits and persuasions to induce the defendant to commit the offense.

The state's appeal is predicated on the ground there is a vestige of the "subjective theory" remaining in the new enactment and that the trial judge erred in not giving adequate weight to the evidence, which indicated defendant's predisposition to commit the crime. Under this concept there are two requirements, inducement by the government and innocence on the part of the defendant. The pertinent issue thereunder is whether the criminal design originated with the officials of the government and they implanted in the mind of an innocent person the disposition to commit the alleged offense and induced its commission in order that they might prosecute.

76–2–303(1), as enacted 1973, provides:

It is a defense that the actor was entrapped into committing the offense. Entrapment occurs when a law enforcement officer or a person directed by or acting in cooperation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

The foregoing follows the format and theory set forth in Sec. 2.13(1) of the Model Penal Code, Proposed Official Draft (1962):

1. Utah, 542 P.2d 744 (1975).

(1) A public law enforcement official or a person acting in cooperation with such an official perpetuates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:

(a) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

(b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.[1]

Significantly, in the Tentative Draft No. 9, another provision was offered, which set forth the subjective theory of entrapment, and the provision which was ultimately adopted by the institute was deemed an alternative formulation. The original proposed provision stated:

A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense he solicits, encourages or otherwise induces another person to engage in conduct constituting such offense when he is not then otherwise disposed to do so.[2]

In the commentary, following the tentative draft, the differentiation between the two theories is explained as follows:

The main issue between the two formulations can be put by considering two examples. Under the main statement,[3] if A, an informer makes overreaching appeals to compassion and friendship and thus moves D to sell narcotics, D has no defense if he is predisposed to narcotics peddling. Under the alternative [4] a defense would be established because the police conduct, not D's predisposition de-

termines the issue. Under the main formulation, A's mere offer to purchase narcotics from D may give rise to the defense, provided D is not predisposed to sell. A contrary result is reached under the alternative. A mere offer to buy hardly creates a serious risk of offending by the innocent.[5]

The foregoing analysis is particularly pertinent to the issues presented. The trial court found, an informer, Charles England, made overreaching appeals to compassion and friendship and thus moved defendant to sell narcotics.

The court stated that assuming the evidence indicating predisposition were true (there was conflicting evidence), the issue was not whether such evidence would justify the entrapment. The court framed the issue as follows:

. . . whether this situation came about by one who was willing under the circumstances to get involved in this situation, or whether, in fact, it was induced, or that there was a substantial risk that it was induced, by a friendship relationship between Charles England and the defendant.

The court continued:

Clearly, that was Charles England's point of view, he knew that as a friend that he could go to Shane Bridwell and some day make a buy from him if he kept working at it long enough. And it is not as though it was just from the 21st [November], because Charles England's own testimony was that at least from the latter part of October, at the latest the first part of November, that he started working the defendant over on trying to make a buy. He knew, he testified that he knew that he could make a buy based upon friendship, or that he could cause a buy to be made.

\* \* \* \* \* \*

1. American Law Institute, Model Penal Code, P.O.D. (1962), § 2.13, p. 43.

2. American Law Institute, Tentative Draft No. 9 (1959), § 2.10, p. 13.

3. Subjective theory.

4. The objective theory that was subsequently adopted by the Institute in 1962.

5. A.L.I., Model Penal Code, Tentative Draft No. 9, § 2.10, p. 19.

Now, you see, even based upon the friendship that existed between the defendant and Charles England, it was at least—at least—24 days under the testimony, and probably more like a month, before the defendant finally agreed to sell. That's under the testimony of Charles England. Charles England said the latter part of October, the forepart of November. Extending that out, he worked on him at least a month.

The court ruled that a jury would have a difficult time finding there was no entrapment, beyond a reasonable doubt. "Accordingly, the motion is granted, under the particular circumstances."

The operative words of Sec. 76–2–303(1) and Sec. 2.13 of the Model Penal Code are the same. There is no provision or phraseology in the statute which can be construed as providing a "predisposition" or "innocence" requirement to constitute an entrapment defense. Concededly, prior to the adoption of this statute, this court had adopted the subjective test, viz, whether the accused had a predisposition to commit the crime.[6] The legislature overruled this court.

The doctrine of entrapment is to promote a social policy.

. . . the chief aims of the criminal law are to prevent men from engaging in socially harmful conduct and to instruct men in the basic requirements of good citizenship. It is consistent with these purposes to recognize a defense based upon those unsavory police methods which have the effect of fostering criminality.[7]

The rationale to sustain the objective theory of entrapment is set forth as follows:

If the defense is available only to persons who are "innocent," the full deterrent effect of the defense is undermined. Police conduct toward a particular defendant may be seriously objectionable even though he entertained a purpose to commit crime prior to any inducement by officials. Law-enforcement officers may feel free to employ forbidden methods if the "innocent" are freed but the habitual offenders, in whom the police have the greater interest, will nevertheless be punished.

Investigation into the character and disposition of the defendant has often obscured the important task of judging the quality of police behavior. The emphasis of court-room inquiry is thus turned from the character of the police conduct to the history of the accused and his immediate reaction to enticement.

The very notion that certain police conduct may be improper in relation to the "innocent" but acceptable when addressed to the "guilty" seems incompatible with the idea of equality before the law. As Mr. Justice Frankfurter put it in his concurring opinion in the *Sherman* case: "Permissible police activity does not vary according to the particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition." 356 U.S. at 383. [78 S.Ct. 819]. Further, to permit the use, against a previously convicted person, of police measures not permitted toward the rest of society is to fix a permanent status of criminality against the hopes of enlightened penology.[8]

A further factor which verifies the legislative intention to enact an objective theory of entrapment is subdivision (6) of Sec. 76–2–303. There it is provided:

In any hearing before a judge or jury where the defense of entrapment is an issue, past offenses of the defendant shall not be admitted . . .

---

6. See *State v. Curtis*, Utah, 542 P.2d 744, 748–750 (1975), wherein the history of the doctrine of entrapment in this state is set forth in the dissent.

7. A.L.I., Model Penal Code, Tentative Draft No. 9 (1959), § 2.10, p. 15.

8. Id., p. 20.

This provision effectively eliminates the opportunity of the prosecution to present proof of the accused's criminal character or predisposition by evidence of his past offenses.

The trial court did not err by limiting the issue of entrapment to the question of whether the informer, Charles England, induced the commission of the offense, by methods creating a substantial risk the offense would be committed by one not otherwise ready to commit it. In applying the objective test, the course of conduct between the accused and the agent of the police should be evaluated. The transactions leading up to the offense, the interaction between the agent and the accused, and the accused's response to the inducements of the agent are all to be considered in judging the effect of the agent's conduct on a normal person.[9]

The majority opinion remands the case for trial by jury of the entrapment issue. Section 76–2–303(4) provides that the court shall hear evidence on the issue and shall determine as a matter of fact and law whether the defendant was entrapped to commit the offense. If the majority is of the view that the subjective theory is applicable under Sec. 76–2–303(1), then the matter should be remanded to the trial court for a determination of the facts. The evidence concerning defendant's predisposition was seriously disputed and no finding was made; there was substantial evidence to support either of the conflicting versions of the event. A review of the relevant statutory provisions indicates this court could only remand a case for a jury trial where the dismissal by the trial court was not based on any substantial evidence to support the defense of entrapment.

Although prolonging this dissent, the facts as revealed through the testimony of defendant and his wife merit review. In *Sherman v. United States*,[10] Justice Frankfurter, in a concurring opinion, advocated the position that the issue of entrapment should be tried by the judge alone. He stated:

. . . Equally important is the consideration that a jury verdict, although it may settle the issue of entrapment in the particular case, cannot give significant guidance for official conduct for the future. Only the court, through the gradual evolution of explicit standards in accumulated precedents, can do this with the degree of certainty that the wise administration of criminal justice demands.

Defendant and his wife had known Charles England for many years. England and defendant had been friends since Junior High School days—some friend. On August 20, England attended defendant's birthday party as a companion of defendant's sister. England sold defendant a bicycle on that same day. Thereafter, England frequently visited in defendant's home. On several occasions, he requested marijuana; he was consistently refused. Defendant and his wife explained to England they had discontinued all use of drugs the previous spring, for the reasons that drugs had caused discord in their marital relationship, and Mrs. Bridwell was expecting a second child. England further ingratiated himself to the Bridwells by bringing his supervisor to their home for the purpose of meeting defendant and possibly employing him. Defendant had been actively seeking work, and, although the meeting did not result in employment, he was grateful for England's interest and assistance.

According to defendant on November 24, England came by his home in the morning urgently seeking marijuana. Defendant described him as nervous and upset. It was under these circumstances that defendant procured the drug, which he sold that evening to England. The majority opinion relates the conflicting testimony of the police officer, who had accompanied England to defendant's home. Significantly, the Bridwells, England, and the officer all differed as to the number of occasions the officer went to the home prior to the sale, which constituted the offense.

---

9. See *Grossman v. Alaska*, Alaska, 457 P.2d 226, 230 (1969).

10. 356 U.S. 369, 385, 78 S.Ct. 819, 827, 2 L.Ed.2d 848 (1958).

The trial judge did not, as a fact-finder, resolve the conflicts. He merely found from the undisputed facts that the methods of England, who was acting in cooperation with the officer, created a substantial risk that defendant would commit the offense.

WILKINS, J., concurs in Justice MAUGHAN'S dissent.