**STATE of Utah, Plaintiff and Respondent,**

v.

**Albert TAYLOR, Defendant and Appellant.**

Nos. 15631, 15645.

Supreme Court of Utah.

Aug. 7, 1979.

Maurice Richards of Public Defenders Association, Ogden, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Craig L. Barlow, Asst. Atty. Gen., Salt Lake City, Robert L. Newey, Weber County Atty., Ogden, for plaintiff-respondent.

MAUGHAN, Justice:

Defendant appeals from two convictions, one by the court and one by the jury, of the crime of distributing for value a controlled substance, heroin, in violation of § 58–37–8(1)(a)(ii), U.C.A., 1953. Defendant has consolidated his two appeals because of the similarity of the factual and legal issues involved. The central issue is whether the trial court erred by denying defendant's motion to dismiss, predicated on the ground of entrapment. The convictions are reversed on the ground the conduct of the police, strictly as proved by the evidence adduced by the State, constituted entrapment, as a matter of law. All statutory references are to U.C.A., 1953 as amended.

Defendant's convictions can only be sustained on the basis of the testimony of a police undercover agent, Annette Stubbs. Stubbs became a heroin addict in approximately March 1977, at the age of seventeen. She supported her addiction by working as a prostitute in Salt Lake City and Ogden. At the time she first discussed becoming an agent for the Ogden police in September 1977, she was being prosecuted on a prostitution charge in Salt Lake City; she denied the police offered her assistance on the charge in exchange for her work as an agent.

The sequence of events which culminated in Stubbs becoming an employee of the police department in Ogden commenced in August 1977. Stubbs had a chance meeting with police officer Burnett; he told her to clean up her act and go home or he would put a "snitch jacket" on her. He rented a motel room for her for two nights for the sum of $40. Their next encounter was on September 21, 1977, on the street. Officer Burnett arranged a meeting with her later in the evening; she failed to appear. How-

ever, the next evening Stubbs went to the office of the narcotics task force. According to Burnett, Stubbs stated she had done some thinking and wanted to assist in rounding up heroin dealers. She also wanted to start a new life. After Stubbs volunteered, the police agreed to pay her $150 per person for those arrested. The payment was contingent on her testifying in court. Officer Burnett testified that he would, in fact, have put a "snitch jacket"[1] on Stubbs if she had stayed on the street.

Stubbs commenced her employment with the police on September 22, 1977. In addition to the $150 per person bounty, she was given at government expense an apartment, a telephone, and $100 per week expenses. During July, August, and September, Stubbs had a heroin habit of three to four balloons per day. Each balloon contained approximately a quarter teaspoon of a substance containing heroin. Each sold for $30. From September 22 to November 9, 1977, Stubbs averaged two balloons approximately every three days. Under the mode of operation, a controlled buy was arranged. Stubbs, a heroin "mainliner," was given $60 to purchase two balloons. She took a kit furnished by the police and injected the contents of one balloon in the presence of the seller. She "walked" with the other balloon and gave it to the police to be used as evidence. Police Officer Searle testified Stubbs was sick on many occasions (heroin withdrawal symptoms). She would then make a controlled buy and recover from her sickness. Stubbs admitted, in addition to the narcotics she took during the controlled buys, she used expense money on five occasions to purchase heroin.

Stubbs testified the police knew she injected narcotics when she made a controlled buy. When she didn't have heroin, she was sick. When she started working for the police, she averaged only one shot every two or three days, and she was "hurting pretty desperately." She admitted she

---

1. He would have spread the rumor she was a police informer among the criminal element in the community.

"snitched" on friends. She made many telephone calls to catch all previous associates; some, who were her friends, helped her to procure heroin. She conceded the money she was to receive for her work was more than she had ever had in her life.

Police Lieutenant Hal Adair, who was in charge of the narcotics force, testified the department had spent $5,500 on Stubbs until the time of the trial. This sum did not include the $150 bonus per person or future costs. After the arrests of the persons accused of selling narcotics to Stubbs, she was placed in protective custody. The sum mentioned did not include the salaries of the police officers providing protection. Stubbs, under police supervision, withdrew from heroin use on November 9, 1977. She went "cold turkey" except for the police giving her valium every four hours.

Stubbs met defendant in March or April 1977; at the time, she was a prostitute and heroin addict. In the spring of 1977, Stubbs moved into the home of defendant's grandmother, where they lived for three or four weeks, enjoying conjugal rights. Then they moved to an apartment where they continued their intimate relationship until approximately a week prior to Stubbs' eighteenth birthday on July 14, 1977. Although Stubbs claimed she did not love defendant, she admitted he had told her he loved her. During the time they lived together, both were heroin addicts. Defendant went through a detoxification program after he moved from the apartment they shared, and returned to his grandmother's home. While the two lived together, they purchased their drugs and injected the substances together. Stubbs supported her addiction by prostitution; defendant was employed. Defendant never pandered for her. Both used all their money for drugs; each loaned the other money if one needed heroin.

When Stubbs asked defendant to leave their apartment there was no acrimony, and the two remained friends. Stubbs, in fact, admitted she shared defendant's bed one night in early September.

Defendant's convictions were for delivery of a controlled substance for value on October 4 and October 10, 1977. However, it is essential to review the course of conduct between Stubbs and defendant leading up to the time of these offenses.

Stubbs commenced her employment with the police on September 22, 1977. On September 27, 1977, she contacted defendant and informed him she was hurting and needed to "score." She requested he procure her two or three balloons. Stubbs admitted that when she called defendant, she let him believe she needed the drugs for her own use; when in fact she was getting him to furnish them so she could "bust" him. Defendant responded that he didn't have any narcotics, but that he'd try to help her. Defendant met her, and the two went together in his automobile to find some heroin. They went to three different places. Defendant went into Robertson's and procured the heroin. Stubbs informed defendant she did not want to share the drugs because she needed them for an elk hunting trip. (Their usual procedure was to share a balloon.) She paid him $10 for his driving her around town. Defendant claimed this sum was repayment of a loan.

On October 4, 1977, Stubbs telephoned defendant at 2:00 o'clock a. m. at his grandmother's house. She asked him to get her two bags of heroin. She informed him she would shoot one and walk with one. She claimed he requested $5. According to Stubbs, she went to defendant's home in a taxi; he answered her knock at the back door. She testified the first thing he asked was whether she had the money. She gave him the money, and he handed her two balloons. She cooked the contents of one balloon and injected it; the other she placed in her purse. Defendant queried what she wanted to do. She told him to call a taxi, which he did. She claimed that she ate a piece of watermelon while she waited. She was in the house approximately thirteen minutes. Defendant denied that any such transaction took place. He presented evidence indicating Stubbs had been present in his home some time early in the evening in the first part of October. She was sick, sweating, and looked pretty bad; she re-

quested water to take a fix (she had her own narcotics). Defendant was taking a bath, and Stubbs talked with defendant's grandmother; then Stubbs evidently left. The defense attempted to show Stubbs had cached heroin in the house, which she then retrieved under police surveillance, creating the impression she had made a controlled purchase. (Under § 76–2–303(3), the defense of entrapment is available even though the actor denies commission of the conduct charged to constitute the offense.)

Defendant testified he had strong feelings for Stubbs during the end of September and first part of October. During the time they lived together, defendant claimed Stubbs told him she loved him. After they separated, they saw each other quite often at bars. During September, defendant was working nights and seldom saw Stubbs except on weekends; however, as noted, she did stay overnight with him once.

The second offense for which defendant was convicted occurred on October 10, 1977. Stubbs telephoned defendant and asked for two bags. Defendant responded he did not have any, would have to go procure it, and he would be home at 7:00 o'clock. The police rented a motel room for Stubbs. She called defendant at 7:30 p. m., informing him of her location. He told her he would be there in five minutes.

Stubbs conceded she had not had a fix for two or three days, and was sick when she called defendant; nevertheless, she claimed she contacted defendant to make a buy for the police, and not to procure a fix for herself. When defendant arrived at the motel, she paid him $60 for two balloons. They shared the contents of one, and she kept the other for evidence.

The defense emphasized the testimony of Stubbs that defendant did not have any heroin when she called him on October 10; he had to go locate the drug for her. Stubbs further admitted she was seeing defendant quite often in October when she made the cases against him. She further conceded she knew on September 27 de-

fendant did not have any drugs because they had to go together to locate a source.

When asked by the defense if she had remarked at the motel that one bag seemed short, to which defendant responded, "Let's look at it, if it is, I'll take it back to the dude; I'm not going to mess around," Stubbs said she could not recall, but admitted the incident could have happened.

Defendant testified that after Stubbs' call he checked with a contact who gave him two bags. He informed the seller who the purchaser was, and promised to bring the money he received from Stubbs to the seller; which defendant subsequently did. He also testified Stubbs had lived with him and knew he was not a heroin dealer. (Stubbs never testified to the contrary.) Defendant testified he acquired the heroin for Stubbs because he thought he was doing her a favor; that she needed it; that she was sick. On October 10, defendant thought Stubbs was his friend and possibly his sweetheart.

There has been a degree of confusion generated over the proper interpretation of the entrapment statute, § 76–2–303, since its enactment in the new Criminal Code in 1973. This problem is vividly illustrated in the trial transcript in the following colloquy:

> The Court: To be honest with you, I think about every time the Supreme Court decides one of these, it becomes more confusing.
>
> The Prosecutor: I concur, Your Honor. I think [State v.] Soroushian [2] is especially confusing.

The difficulty in interpretation of the entrapment statute has been primarily engendered by the attempts of this Court to engraft the case law setting forth the subjective standard onto a new statute, which by its express terms incorporates the objective standard.

Under the subjective test for entrapment, courts make two inquiries: (1) whether there was an inducement on the part of the government; and (2) if so, whether the

---

**2.** Utah, 571 P.2d 1370 (1977).

defendant showed any predisposition to commit the offense.[3] Under this view, which was adopted by the majority in *Sorrells v. United States*,[4] the officers of government may afford opportunities to commit crime by employing artifice and stratagems to apprehend persons engaged in criminal enterprise. However, they cannot implant in the mind of an innocent person the disposition to commit an offense and induce its commission in order to prosecute. The defense of entrapment, under this view, is applicable only when the criminal conduct is the product of the creative activity of the government agents. Thus the critical issue is whether the particular defendant was predisposed to commit the crime; or was an otherwise innocent person, who would not have erred, except for the persuasion of the government's agents. Under this view, a searching inquiry is permitted into the conduct and motivations of both the officers and the defendant, including the past conduct of the defendant in committing similar crimes; and the general activities and character of defendant.[5]

Under the objective view of entrapment, the focus is not on the propensities and predisposition of the specific defendant, but on whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.[6] This concept establishes entrapment on its historical basis; the refusal to countenance a perversion of justice by government misconduct. The objective view provides a solid definitive standard upon which the defense can rest, i. e., does the conduct of the government comport with a fair and honorable administration of justice?

Under the objective view, the defense does not deprive the police of the use of decoys to afford a person an opportunity to commit crime; however, it does deny the use of decoys to present actively, inducements for the purpose of luring a person into the commission of an offense. The government is not permitted to engage in the manufacture of crime. The prime duty of the government's law enforcement agencies is the prevention of crime through the apprehension of those anti-social persons who, without inducement, are engaged in the commission of crime.

■ Entrapment, as a defense, is not available to one who is induced by a private person to commit a crime. Since entrapment can be asserted only when one is induced to commit a crime by a government agent, the obvious focus of this defense is directed to the conduct of the government. This is the precise rationale expounded in *Salt Lake City v. Robinson*,[7] and *State v. McCornish*,[8] wherein the concept of entrapment as a defense was incorporated as part of the decisional law of Utah.

In *State v. McCornish*, this Court stated:

Policemen are conservators of the peace. It is their duty to prevent crime, not to instigate and encourage its commission. Nothing can be more reprehensible than to induce the commission of crime for the purpose of apprehending and convicting the perpetrator. To advise or encourage a criminal act is in itself a crime. Comp. Laws Utah, § 7919. In his zeal and anxiety to apprehend someone in a criminal act, this city detective deliberately planned and induced the commission of an offense which otherwise would not have been committed by anyone.

By these strictures we do not intend to criticize the good services rendered by

---

**3.** 62 A.L.R.3d 110, Anno.: Modern Status of the Law Concerning Entrapment to Commit Narcotics Offense—State Cases, § 2(a), p. 114.

**4.** 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

**5.** The majority opinion in *Sorrells* was reaffirmed in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *United*

*States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

**6.** See dissenting opinion, Justice Brennan, *Hampton v. United States*, 425 U.S. 484, 496–497, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).

**7.** 40 Utah 448, 125 P. 657 (1912).

**8.** 59 Utah 58, 201 P. 637 (1921).

faithful policemen generally, but in the language of the Supreme Court of Colorado in *Connor v. People,* 18 Colo. 373, 33 P. 159, 25 L.R.A. 341, 36 Am.St.Rep. 295:

We do not say that when in their zeal, or under a mistaken sense of duty, detectives suggest the commission of a crime and instigate others to take part in its commission in order to arrest them while in the act, although the purpose may be to capture old offenders, their conduct is not only reprehensible, but criminal, and ought to be rebuked rather than encouraged by the courts.

Subsequently, the Court deviated from the objective view of entrapment as set forth in *Robinson* and *McCornish* and adopted the subjective view, focusing on the defendant's predisposition.

. . . if the defendant's attitude of mind was such that he desired and intended to commit the crime, the mere fact that an officer or someone else afforded him the opportunity to commit it would not constitute entrapment which would be a defense to its commission; and this would not be less true even though an undercover man went along with the defendant in the criminal plan and aided or encouraged him in it.[9]

Thus, this Court adopted the view of Chief Justice Warren in *Sherman v. United States*:[10]

. . . To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. . . .

In *State v. Curtis,*[11] the majority opinion of this Court stated the previous expressions in *Pacheco* and *Perkins* were in harmony with the statutory definition of entrapment in § 76–2–303(1), as enacted by the legislature in 1973.[12]

In *State v. Hansen,*[13] it is stated:

. . . Though the statutory language is concededly not exactly the same as used in some of our cases, we do not see that it has effected any substantial change in the meaning of our previous rulings in regard to when entrapment occurs.

. . . Whenever there is a genuine issue as to entrapment, the critical question to be determined remains: whether the crime is mainly the product of the defendant's own intent and desire and is thus his voluntary act, or whether it is mainly the product of some incitement or inducement by the police officer.

Thus this Court has stubbornly adhered to the subjective test, predisposition of the defendant, rather than following the objective standard set forth by the legislature in § 76–2–303.

Justice Frankfurter, an adherent of the objective standard, observed in a concurring opinion in *Sherman v. United States,*[14] that it was wholly irrelevant to ask if the intention to commit the crime originated with the defendant or government officers; or if the criminal conduct were the product of the creative activity of law enforcement officials. In every case of this type, the intention that the particular crime be committed originates with the police, and without their inducement, the crime would not have occurred. Yet it is perfectly clear that where the police merely furnish an opportunity for the commission of the crime, this is insufficient for the defendant to escape conviction.

The intention referred to, therefore, must be a general intention or predisposition to commit, whenever the opportunity

---

**9.** *State v. Pacheco,* 13 Utah 2d 148, 151, 369 P.2d 494, 496 (1962); also see *State v. Perkins,* 19 Utah 2d 421, 432 P.2d 50 (1967).

**10.** 356 U.S. 369, 372–373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958).

**11.** Utah, 542 P.2d 744, 746 (1975).

**12.** Also see *State v. Bridwell,* Utah, 566 P.2d 1232 (1977); *State v. Casias,* Utah, 567 P.2d 1097 (1977); *State v. Hansen,* Utah, 588 P.2d 164 (1978).

**13.** Supra, Note 12.

**14.** Supra, Note 10, 356 U.S. at 382, 383, 78 S.Ct. 819.

should arise, crimes of the kind solicited, and in proof of such a predisposition evidence has often been admitted to show the defendant's reputation, criminal activities, and prior disposition. . . . Furthermore, a test that looks to the character and predisposition of the defendant rather than the conduct of the police loses sight of the underlying reason for the defense of entrapment. No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society. . . . Permissible police activity does not vary according to the particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition. No more does it vary according to the suspicions, reasonable or unreasonable, of the police concerning the defendant's activities. Appeals to sympathy, friendship, the possibility of exorbitant gain, and so forth, can no more be tolerated when directed against a past offender than against the ordinary law-abiding citizen. A contrary view runs afoul of fundamental principles of equality under law, and would espouse the notion that when dealing with the criminal classes anything goes. The possibility that no matter what his past crimes and general disposition the defendant might not have committed the particular crime unless confronted with inordinate inducements, must not be ignored. Past crimes do not forever outlaw the criminal and open him to police practices, aimed at securing his repeated conviction, from which the ordinary citizen is protected. The whole ameliorative hopes of modern penology and prison administration strongly counsel against such a view.

Section 76–2–303(1), as enacted 1973, provides:

It is a defense that the actor was entrapped into committing the offense. Entrapment occurs when a law enforcement officer or a person directed by or acting in co-operation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

This statute follows the format and theory (objective) set forth in § 2.13(1) of the Model Penal Code, Proposed Official Draft (1962):

(1) A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:

(a) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

(b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.[15]

A comparison of the statute with the foregoing section clearly indicates the operative words are the same. Significantly, prior to the adoption of the official draft, another provision was offered in the Tentative Draft No. 9, which sets forth the subjective theory of entrapment; while the provision which was ultimately accepted by the institute in the official draft was initially offered as an alternative formulation. The original proposed provision provided:

A public law enforcement officer or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense he solicits, en-

---

**15.** American Law Institute, Model Penal Code, P.O.D. (1962), § 2.13, p. 43.

courages or otherwise induces another person to engage in conduct constituting such offense when he is not then otherwise disposed to do so.[16]

The differentiation between the two theories is explained in the commentary as follows:

> The main issue between the two formulations can be put by considering two examples. Under the main statement [subjective theory], if A, an informer makes overreaching appeals to compassion and friendship and thus moves D to sell narcotics, D has no defense if he is predisposed to narcotics peddling. Under the alternative [objective theory] a defense would be established because the police conduct, not D's predisposition, determines the issue. Under the main formulation, A's mere offer to purchase narcotics from D may give rise to the defense, provided D is not predisposed to sell. A contrary result is reached under the alternative. A mere offer to buy hardly creates a serious risk of offending by the innocent.[17]

There is no provision or phraseology in § 76–2–303(1) which can be rationally construed as providing a "predisposition" or "innocence" requirement to constitute an entrapment defense. The legislative intent to adopt the objective theory of entrapment is further verified in subdivision (6) of § 76–2–303:

> In any hearing before a judge or jury where the defense of entrapment is an issue, past offenses of the defendant shall not be admitted . . .

The effect of this provision is to eliminate the opportunity for the prosecution to present proof of the accused's criminal character or predisposition by evidence of his past offenses. The subjective test adopted by this Court in *Pacheco* was specifically rejected by the legislature upon its enactment of § 76–2–303.

In assessing police conduct under the objective standard, the test to determine an unlawful entrapment is whether a law enforcement official or an agent, in order to obtain evidence of the commission of an offense, induced the defendant to commit such an offense by persuasion or inducement which would be effective to persuade an average person, other than one who was merely given the opportunity to commit the offense.

Extreme pleas of desperate illness or appeals based primarily on sympathy, pity, or close personal friendship, or offers of inordinate sums of money, are examples, depending on an evaluation of the circumstances in each case, of what might constitute prohibited police conduct. In evaluating the course of conduct between the government representative and the defendant, the transactions leading up to the offense, the interaction between the agent and the defendant, and the response to the inducements of the agent, are all to be considered in judging what the effect of the governmental agent's conduct would be on a normal person.[18]

In the instant case, the police agent, Annette Stubbs, and defendant had cohabited until the first week of July. During the time they engaged in this illicit intimate relationship, they were both heroin addicts who procured and injected their drugs in a spirit of togetherness. Although they subsequently occupied separate dwellings, they remained close friends. Stubbs admitted she shared defendant's bed sometime in September, the same month she contacted defendant for the purpose of making a controlled buy to obtain evidence to convict him. Defendant, as an addict who had recently undergone detoxification, had personally experienced the agonies of withdrawal, and could empathize with this girl he loved, who pleaded for assistance in locating heroin. Thus he responded to her plea, and in September took her in his auto-

**16.** American Law Institute, Tentative Draft No. 9 (1959), § 2.10, p. 13.

**17.** *Id.* at 19.

**18.** *Grossman v. State*, Alaska, 457 P.2d 226, 229–230 (1969).

mobile, while they searched for a source of narcotics. The record is replete with evidence as to defendant's motivation to accommodate Annette Stubbs, viz., his sympathy, his pity, and his close personal relationship with her.

The situation at hand is not unlike that in *Wall v. United States*.[19] There, the government employed as an informer, a former drug addict, who had previously lived with defendant, intermittently, as his mistress. The testimony was in dispute as to what occurred when defendant arranged a sale of narcotics to the informer. The trial court denied an instruction on entrapment, the Circuit Court of Appeals reversed and stated:

> . . . if they took advantage of the sympathy appellant would naturally have for Isabel Knowles because of their former illicit intimate relations and thereby induced appellant to put the agents in touch with Zarata to pander to her craving for morphine, and he was acting solely in the belief that by doing so he would alleviate her suffering, and he was not in any other way interested in the unlawful sale, this would amount to entrapment, and the conviction could not be sustained.
> . . . [20]

From the testimony adduced by the State, the evidence establishes as a matter of law that Annette Stubbs induced the commission of the offense by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. It should be emphasized defendant engaged in conduct proscribed by statute and was guilty of a crime. However, his conviction cannot stand for the reason the statute condemns the conduct of the State in inducing the crime, as a perversion of the proper standards of administration of criminal law.

The evidentiary issue submitted by defendant is moot under the objective view of entrapment, since the evidence was offered under the subjective theory in order to show his predisposition to commit the offense.

WILKINS and STEWART, JJ., concur.

HALL, Justice (concurring in result):

I concur in reversing the conviction, but do so without discarding the so-called "subjective" test of entrapment in favor of the so-called "objective" test.

I adhere to the holding of this court in *State v. Hansen*,[1] wherein it was noted that our statute [2] defining entrapment "expressly recognizes *both* concepts: the 'methods' employed by the police and whether the crime was committed 'by one not otherwise ready to commit it.'"

It is clear under the facts of this case that the application of either test, or both, causes the inescapable conclusion that entrapment occurred.

CROCKETT, Chief Justice (dissenting):

The trial court gave entirely adequate, clear and understandable instructions on entrapment:

No. 10. It is a defense that the defendant was entrapped into committing the offense. *Entrapment occurs when a law enforcement officer* or a person directed by or acting in cooperation with the officer *induces the commission of an offense* in order to obtain evidence of the commission for prosecution *by methods creating a substantial risk* that *the offense would be committed by one not otherwise ready to commit it.* Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

No. 11. Entrapment is properly regarded as a factor *tending to raise a reasonable doubt* that defendant freely and voluntarily committed the offense charged; in determining the validity of an entrapment defense, the jury must

---

**19.** 65 F.2d 993 (5 Cir. 1933).

**20.** *Id.* at 994.

**1.** Utah, 588 P.2d 164, 166 (1978).

**2.** U.C.A., 1953, 76–2–303(1).

therefore consider (1) whether it appears *beyond a reasonable doubt that the crime was the result of defendant's voluntary will* and desire to commit it, or (2) whether it was induced or motivated by actions of the police officers; *if evidence* as to the second proposition *raises a reasonable doubt* as to the validity of the first, *there can be no conviction.* [All emphasis herein added.]

Those, together with other instructions, plainly and fairly presented to the jury the issue as to whether they believed from the evidence beyond a reasonable doubt that the defendant on his own initiative voluntarily committed the crime. They so concluded and the trial court similarly gave its approval. I have no desire to join in becoming a super-jury to free this defendant. It appears that this conviction was obtained after careful and extensive investigation into a crime that is carried on with the greatest possible deviousness and secrecy.

Defendant was afforded full opportunity to stand upon his rights and have the advantage of all of the protections of our law. Upon a fair trial, he was convicted of being engaged in dealing in heroin. It is one of the most iniquitous of crimes because it has such far-reaching effects in the world of crime in that it is interrelated with so many others. In that connection, it is appropriate to observe that this was not any isolated transaction, but that in addition to the crime charged, the evidence plainly indicates that over considerable period of time the defendant had been involved in trafficking in heroin with various other persons.

I would affirm the jury verdict and the judgment.