**STATE of Utah, Plaintiff and Respondent,**

v.

**Lynn L. BELT, Defendant and Appellant.**

**No. 880169–CA.**

Court of Appeals of Utah.

Sept. 26, 1989.

Lynn R. Brown and Elizabeth A. Bowman, Salt Lake City, for defendant and appellant.

R. Paul Van Dam and Barbara Bearnson, Salt Lake City, for plaintiff and respondent.

Before DAVIDSON, GARFF and GREENWOOD, JJ.

DAVIDSON, Judge:

Defendant appeals from his conviction of two counts of receiving stolen property, in violation of Utah Code Ann. § 76-6-408(1) (Supp.1989). Defendant argues on appeal that the methods and conduct employed by Sergeant Charles Illsley, a member of the Metro Major Felony Unit, constituted entrapment under Utah Code Ann. § 76-2-303(1) (1978). Defendant also argues that the trial court erred by failing to declare a mistrial after it dismissed, for insufficient evidence, the charge of offering to sell a controlled substance. Defendant finally contends that the evidence was insufficient to convict him of two counts of receiving stolen property. We affirm.

## FACTS

In 1986, the Metro Major Felony Unit established an undercover operation involving the purchase and sale of stolen property. On March 4, 1986, some of the members of the undercover unit, including Illsley, met at Dee's Family Restaurant (Dee's) at 2100 South and Redwood Road in Salt Lake City. Illsley observed defendant at another table speaking to "Galen," an individual known to the undercover unit for his transactions in stolen property. Sometime in June 1986, Illsley again observed defendant at the Dee's counter. He walked up to defendant and said he wished "Galen" would get a phone. Defendant made no response.

As part of the undercover operation, Illsley purchased three television sets from a retail store for $301. These sets were concealed under a blanket in the trunk of his car. On July 8, 1986, Illsley drove by Dee's and observed defendant standing in the parking lot next to his vehicle. Illsley called to defendant and asked him if he would be seeing "Galen" later. Defendant responded that he saw "Galen" everyday. Illsley showed the sets to defendant and told him to tell "Galen" that he had them. Defendant asked Illsley what he was "looking for" on the televisions; Illsley responded, "one bill," to which defendant responded, he could "get them in the store for less than that." Illsley clarified that he meant

one bill for all three. Defendant examined one of the televisions and Illsley told him that he had peeled the serial numbers and the store labels off the boxes "so there won't be a hassle."

Defendant's wife was also present. She testified that defendant asked her for some money. She asked him, "What for?" He replied, "For some televisions." She responded by asking, "Well, are they stolen?" To which he said, "No. They are just overage off the dock. Everything is fine." She gave him a $100 bill that he used to pay Illsley for the televisions.

The following day, defendant contacted Jerry Hobbs, a sergeant now retired from the Salt Lake County Sheriff's Office, and inquired about having a National Crime Information Center ("NCIC") check run on the televisions to see if they were stolen. Hobbs testified that he never heard back from defendant. However, defendant testified that he did not follow through because a family friend and buyer of one of the televisions told him the televisions were not stolen. The family friend was stopped by police soon after purchasing one of the television sets. The police briefly detained the friend while they ran a check on the television set's serial number. After running the serial number check, the police released the friend. The friend then called another officer to have an NCIC check run on the television. The check proved negative. This information was given to defendant.

On July 18, 1986, Illsley contacted defendant at Dee's. Illsley had purchased a videocassette recorder for $299 and he offered it to defendant for $100. Illsley told defendant that the serial number had been cut from the box and that he "got it off a truck and there wouldn't be a problem with it." Illsley told defendant that he had three more videocassette recorders. Defendant replied that he was interested and that Illsley should contact him at home. Defendant then paid for the videocassette recorder and left.

Illsley called defendant on July 20, 1986 and they arranged to meet at Dee's. Illsley, fitted with a wireless transmitter, met defendant in the parking lot and at defendant's suggestion, they drove to an empty parking lot. Illsley had three videocassette recorders in his car that he had purchased for approximately $1200. He told defendant he wanted "three bills" for the videocassette recorders. Defendant gave Illsley $300 for the three videocassette recorders and loaded them onto his truck. Illsley told defendant that the store name and serial numbers had been cut off; defendant replied, "I don't want to hear about the serial number or store names" and that they should "just do our business."

Illsley and defendant discussed possible future transactions and defendant remarked that he was looking for a video camera and the possibility of acquiring a nineteen-inch television. Defendant told Illsley that he had "checked [him] out with Galen" and that if "he weren't a friend of Galen's," he would not be talking to him. Illsley assured defendant that there would not "be any heat ever on anything."

On July 23, 1986, Illsley telephoned defendant and told him to call back from a pay phone. Defendant called back and they made arrangements to meet at a house used by undercover officers as a base of operation. The house was equipped with a microphone, video camera, and television monitor. Defendant arrived at the house at approximately 10:00 p.m. Illsley testified that defendant acted reluctant or paranoid, but that he kept reassuring defendant that everything was "checked out" and that there would be no problems. He testified that he did this to maintain credibility with defendant. Illsley had purchased a nineteen-inch television set from a retail store for $299 and showed it to defendant. Defendant asked if it was "boosted." [1] Illsley reassured him that "I didn't boost it, it's off a truck." Defendant purchased the television for $100.

During this transaction, defendant told Illsley that he would be able to provide him with "crank," a street name for methamphetamine, a controlled substance. How-

---

1. In street parlance, the term "boost" refers to   shoplifter or stolen goods.

ever, in subsequent telephone conversations, defendant indicated that "the [drug] deal was off."

Defendant was charged with four counts of theft by receiving stolen goods and one count of offering, agreeing, or arranging to distribute for value a controlled substance. He was convicted by a jury of two counts of theft by receiving for the transactions involving the three videocassette recorders and the nineteen-inch television. The court dismissed the charge of offering, agreeing, or arranging to distribute for value a controlled substance.

## THE AFFIRMATIVE DEFENSE OF ENTRAPMENT

"Entrapment occurs when a law enforcement officer ... induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it." Utah Code Ann. § 76–2–303(1) (1978). However, "[c]onduct merely affording a person an opportunity to commit an offense does not constitute entrapment." *Id.*

■ The Utah Supreme Court in *State v. Taylor*, 599 P.2d 496 (Utah 1979), adopted an objective test for determining whether a defendant has been entrapped. The test is whether police conduct used in obtaining evidence of the commission of an offense rose to the level of inducement or persuasion that would effectively persuade the average person to commit the offense. *Id.* at 503. In other words, the standard for determining reasonable doubt is "whether the offense committed was the product of the defendant's initiative and desire, or was induced by the persistent requests of [the undercover agent]." *State v. Sprague*, 680 P.2d 404, 406 (Utah 1984) (quoting *State v. Kourbelas*, 621 P.2d 1238, 1240 (Utah 1980)). The court in *Taylor* listed some examples of when police conduct rises to the level of inducement. "Extreme pleas of desperate illness or appeals based primarily on sympathy, pity, or close personal friendship, or offers of inordinate sums of money, are examples, depending on an

evaluation of the circumstances in each case, of what might constitute prohibited police conduct." *Taylor*, 599 P.2d at 503.

■ In reviewing Illsley's conduct as an undercover officer in relation to defendant's offenses, the particular circumstances under which the offenses occurred must be considered. *State v. Cripps*, 692 P.2d 747, 749 (Utah 1984). Illsley was not a friend of defendant's nor did he encourage such a relationship. Illsley knew that defendant was acquainted with "Galen," a person who had been involved with Illsley in transactions in stolen goods. Illsley held himself out to be a rather scruffy-looking friend of "Galen," who sold brand new goods, allegedly obtained off a truck. Illsley did not resort to pity, sympathy, or money to involve defendant in the transaction. In fact, in his first encounter with defendant, Illsley asked for "Galen," giving the appearance that he was not seeking out defendant at all. Later, defendant checked with "Galen" to confirm Illsley's identity. Illsley merely afforded defendant an opportunity to commit an offense. We cannot conclude defendant was entrapped.

## FAILURE TO DECLARE A MISTRIAL

Defendant contends that the trial court erred by failing to declare a mistrial after it dismissed the drug charge. Defendant argues that evidence of the charge was prejudicial to him and that absent such prejudicial error, there is a reasonable likelihood defendant would not have been convicted. However, defendant knew he was charged with offering to sell a controlled substance and could have brought a motion under Utah R.Crim.P. 9(d) that the offenses be tried separately. Rule 9(d) states in pertinent part as follows:

> If it appears that a defendant or the prosecution is prejudiced by a joinder of offenses or defendants in an indictment or information, or by a joinder for trial together, the court shall order an election of separate trials of separate counts, or grant a severance of defendants, or provide such other relief as justice requires.

A defendant's right to severance of offenses or defendants is *waived if the motion is not made at least five days before trial.*

Utah R.Crim.P. 9(d) (emphasis added).

■ Defendant did not file such a motion, but instead waited to object to the evidence until after the State rested. The trial court granted defendant's motion to dismiss but refused to declare a mistrial. We will not allow a defendant who fails to timely object to use that failure to overturn a conviction. By failing to use rule 9(d) and to timely object to the evidence, defendant waived any right to claim prejudice. *See State v. John*, 667 P.2d 32, 33–34 (Utah 1983).

## SUFFICIENCY OF THE EVIDENCE

Defendant contends that the evidence was insufficient to convict him of two counts of receiving stolen property. In a jury trial in a criminal proceeding, we review the evidence and all inferences which may reasonably be drawn therefrom in the light most favorable to the jury verdict. *State v. Petree*, 659 P.2d 443, 444 (Utah 1983). "We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id. See also State v. Lamm*, 606 P.2d 229, 231 (Utah 1980); *State v. Daniels*, 584 P.2d 880, 882–83 (Utah 1978).

Defendant was convicted of two counts of receiving stolen property in violation of Utah Code Ann. § 76–6–408(1) (Supp.1989) which provides, in part, as follows:

A person commits theft if he receives, retains, or disposes of the property of another knowing that it has been stolen, or *believing that it probably has been stolen,* ... with a purpose to deprive the owner thereof.

(emphasis added).

■ The facts of the present case fall within the definition of believing that the property probably has been stolen. On the occasion when Illsley offered defendant the three videocassette recorders, Illsley told defendant that the store name and the serial numbers were torn off the boxes. Defendant responded that he did not want to hear about where the goods came from. Instead, he just wanted to get "this business" over with. Furthermore, defendant suspected the goods may have been stolen when he phoned retired Sergeant Hobbs to have an NCIC check run on the goods. Other evidence indicating that defendant knew the goods may have been stolen included: his wife asking if the goods were stolen before she handed him the $100 bill; Illsley testifying that during the July 23 meeting, he mentioned to defendant that he did not want to get pulled over by the cops; and defendant's response that the cops could pull him over because they did not have the serial numbers. Furthermore, Illsley testified that defendant said, "If you were a cop, you would have had me by now anyway. I understand you boost this stuff." Illsley also testified that he started to answer but that defendant cut him off and said, "I don't want to know what you are doing." Regarding the serial numbers, Illsley testified that defendant remarked, "I wish you wouldn't cut the serial numbers off. That makes it look hot."

This evidence is sufficient to show that reasonable minds could find that defendant believed the goods were stolen.

Affirmed.

GARFF and GREENWOOD, JJ., concur.