2020 UT App 61

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RONALD LINDSEY HATCHETT,
Appellant.

Opinion
No. 20181042-CA
Filed April 9, 2020

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 171400638

Douglas J. Thompson and Margaret P. Lindsay,
Attorneys for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

ORME, Judge:

¶1    Ronald Lindsey Hatchett appeals his two convictions for enticement of a minor, arguing that the district court erred in denying his motion to dismiss on the ground that he was entrapped. He argues that law enforcement "created a substantial risk that the offense of enticement would occur" when a special agent, posing as a 13-year-old boy, responded to Hatchett's advertisement in the Craigslist personals section. We disagree and affirm his convictions.

BACKGROUND[1]

¶2    In anticipation of an upcoming visit to Utah, Hatchett posted an advertisement on Craigslist in the "men seeking men" personals section entitled "Dad looking for Son (Provo)." The advertisement read:

> Hey Guys,
> I am coming in for the weekend and am looking for a 18–25 year old guy to party and play with. I am a 50 yr old 6'2'' 230 lb 6'' thick cock HIV and STD free and you must be also. I would love to party, and if you have a connect for Coke or whatever that would be fantastic and play. I am vers and love kissing, sucking, being sucked, ass and nipple play and fucking. I will be in Saturday and will leave Monday so if you want to spend the night that would be fun. Hit me up and let's plan something out!

¶3    The advertisement caught the attention of a special agent (Special Agent) in the Utah Attorney General's Internet Crimes Against Children Task Force. Posing as "Cade,"[2] Special Agent responded to the ad: "saw ur post how yung is 2 yung." The following conversation then ensued via email:

---

1. Hatchett does not challenge the district court's findings of fact on appeal. Indeed, in opposing Hatchett's motion to dismiss on entrapment grounds, the State accepted the facts set forth in his motion as true. Accordingly, "we recite the facts in the light most favorable to the trial court's findings." *State v. Eberwein*, 2001 UT App 71, ¶ 2, 21 P.3d 1139 (quotation simplified).

2. To better facilitate recounting the facts of this case, we sometimes refer to Special Agent by his undercover persona, "Cade," in this opinion.

[Hatchett:] How old are you?

[Cade:] old enuff 2 no what i want, middle school but lik coke

[Hatchett:] Nice. Do you have a connect?[3] What are your stats? What are you into?

[Cade:] i wish

[Hatchett:] So what are your stats and what are you into?

[Cade:] almost 14 m whatever

[Hatchett:] Nice. How tall, weight?

[Cade:] idk average thin

[Hatchett:] Nice. If we do meet up it would have to be our little secret. You a top?[4]
Do you like to drink? What other kind of things do you like to do when you party? Do you smoke anything.

[Cade:] ya what do u want 2 do

[Hatchett:] Party and whatever happens happens

[Cade:] thats cool i would need to sneak out tho

As the conversation continued, Hatchett asked whether Cade was "gay or just curious" and stated, "It would be fun to at least party" with Cade during his upcoming visit to Provo, immediately followed by the query, "You aren't a cop right?" Cade replied, "ya right r u dont want 2 get in trouble," which appeared to satisfy Hatchett's concern.

---

3. This appears to be in reference to the Craigslist advertisement in which Hatchett stated that "a connect[ion] for Coke or whatever . . . would be fantastic." And "Coke," based on the need for "a connect[ion]" and the illicit substances later found in Hatchett's hotel room, in all likelihood referred to cocaine rather than the soft drink.

4. In a later conversation with Cade, Hatchett clarified that "To[p]" refers to the man who penetrates his sexual partner during intercourse.

¶4     After they eventually exchanged phone numbers, Hatchett and Cade continued to communicate for several weeks. Hatchett initiated at least sixteen text-message and three telephone conversations with Cade, while Cade initiated two text-message conversations, one of which occurred on the morning of Hatchett's eventual arrest. Whenever Hatchett asked Cade what he wanted to do when they met up, Cade would respond evasively by stating that he did not know. Cade never proposed specific sex acts. Hatchett, on the other hand, repeatedly steered their conversations in a sexual direction. For example:

- "Ectacy is real cool to. Makes you feel up and horney as hell. Lol."

- "I think we should party for a bit maybe smoke some weed and drink a couple of beers while we get to know each other and then lay on the bed and kiss and get naked and cuddle. Once you are comfortable we might give each other a bj [i.e., blow job] or whatever you feel comfortable doing."

- "I think we will party and maybe kiss and get naked in bed and see what happens."

- "I am nice. I have never done anything with a guy as young as you but it's kind of exciting."

- "We just have to keep it on the down low. Lol. I don't want to end up in jail. Hahaha."

- "What ever you want. Bj's and maybe more if you want and it goes there. It's all up to yourself. Get naked and explore each other's bodies. Maybe. This is making me very scared. Your not a cop right?"

Hatchett also asked Cade to give measurements and send pictures of his genitals, which Cade did not do. Hatchett also offered to procure alcohol and drugs for their expected encounter.

¶5    Law enforcement arrested Hatchett when he arrived at the gas station in Provo where he and Cade had arranged to meet. He subsequently admitted to bringing cocaine and ecstasy with him and consented to a search of his hotel room. The search revealed pills, "a pipe with marijuana residue," and substances that were later determined to be cocaine and methamphetamine.

¶6    The State charged Hatchett with two counts of enticement of a minor and one count each of possession of a controlled substance with intent to distribute and possession of drug paraphernalia. Asserting the defense of entrapment, Hatchett moved the district court to dismiss the charges against him.

¶7    At the evidentiary hearing on the motion, Hatchett testified that "son" in the gay community "is used as a term saying that you're looking for someone that is younger than your age" but not necessarily a minor. He also testified that he "felt from the text messages that were being exchanged, that it wasn't a 14 year old talking to [him], it was somebody older." Specifically, Hatchett claimed that he believed he was speaking to an adult because Cade did not use the teenage "lingo" that Hatchett's own teenagers used and because Cade did not know much about video games. For that reason, Hatchett testified he engaged with Cade as a "fantasy" and went to the gas station "[j]ust to see if [Cade] was really . . . under 18. If he was, [Hatchett] would have drove away."

¶8    The district court denied Hatchett's motion to dismiss. It determined that Special Agent's actions did not "induce[] the commission of the offense by methods creating a substantial risk that the offense would be committed by a reasonable person not otherwise ready to commit it." Specifically, the court found that after an advertisement entitled "Dad looking for Son (Provo)"

"propos[ing] both a sexual encounter in Utah and use of illegal drugs" caught his attention, Special Agent "lawfully accessed Craigslist and created . . . a fictitious and underage persona" to simply inquire, "'How young is too young.'" Special Agent then continued to respond to Hatchett after it became readily apparent that Hatchett was undeterred by the fact that Cade was "almost 14" years old. Following the initial conversation, Special Agent initiated contact with Hatchett only twice and "[a]t no time . . . propose[d] specific sex acts." Based on these facts, the court concluded that "[a]t most, [Special] Agent afforded the mere opportunity to commit the offense."

¶9 A jury, necessarily rejecting Hatchett's entrapment defense and his claim that he believed Cade was an adult pretending to be a minor for "fantasy" purposes, convicted Hatchett of all crimes charged. Hatchett appeals.

ISSUE AND STANDARD OF REVIEW

¶10 Hatchett argues that the district court erroneously denied his motion to dismiss on entrapment grounds.[5] An entrapment ruling involves a mixed question of law and fact. *State v. Haltom*, 2005 UT App 348, ¶ 7, 121 P.3d 42. Here, Hatchett does not challenge the district court's findings of fact. Accordingly, "we will affirm the trial court's decision unless we can hold, based on the given facts, that reasonable minds cannot differ as to whether entrapment occurred." *Id.* (quotation simplified). "Only when reasonable minds could not differ can we find entrapment as a matter of law." *Id.*

---

5. Hatchett addresses entrapment only in terms of his enticement-of-a-minor convictions and his argument is silent as to his drug-related convictions. He likewise presents no challenge to the jury's refusal to accept his entrapment defense at trial.

ANALYSIS

¶11 The Utah Code defines the affirmative defense of entrapment as follows:

> Entrapment occurs when a peace officer or a person directed by or acting in cooperation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

Utah Code Ann. § 76-2-303(1) (LexisNexis 2017). This definition "by its express terms incorporates [an] objective standard," *State v. Taylor*, 599 P.2d 496, 499 (Utah 1979), "which focuses solely on police conduct, rather than on the defendant's predisposition to commit a crime," *State v. Torres*, 2000 UT 100, ¶ 8, 16 P.3d 1242.

¶12 "To prove the defense of entrapment, the evidence must be sufficient to raise a reasonable doubt that the defendant freely and voluntarily committed the offense." *Id.* (quotation simplified). This "is a highly fact-intensive" inquiry, *id.* (quotation simplified), which "depend[s] on an evaluation of the circumstances in each case," *Taylor*, 599 P.2d at 503. *See State v. Haltom*, 2005 UT App 348, ¶ 11, 121 P.3d 42 ("Utah has never recognized a per se rule of entrapment.") (quotation simplified). Examples of improper police conduct that constitute entrapment, "depending on an evaluation of the circumstances in each case," include inducement by means of "[e]xtreme pleas of desperate illness or appeals based primarily on sympathy, pity, or close personal friendship, or offers of inordinate sums of money," *Taylor*, 599 P.2d at 503, as well as "personalized high-pressure tactics, and appeals to extreme vulnerability," *State v. Martinez*, 848 P.2d 702, 706 (Utah Ct. App. 1993).

¶13 Hatchett argues that "even though [his] response[s] to the police inducements may seem inappropriate, they are the result of the police methods which created a substantial risk that the offense of enticement would occur." He claims that Special Agent "employed methods designed specifically to lead [his] targets into saying what needed to be said for [the] crime to occur," such as "deception and innuendo."[6] But the only methods of which he complains are that Special Agent, "without any prior knowledge that Hatchett had sexual interest in minors," responded to an advertisement specifically seeking adult men between the ages of 18 and 25, and absent that initial contact, "no crime would have ever occurred." He does not rely on the substance of Cade's messages in asserting that Special Agent improperly induced him into enticing a minor.

¶14 Hatchett cites *State v. Kourbelas*, 621 P.2d 1238 (Utah 1980), in support of his contention that he was entrapped when law enforcement targeted him without "any prior knowledge that [he] had sexual interest in minors." In *Kourbelas*, an undercover narcotics officer, posing as the assistant manager of a gas dock on Lake Powell, approached the defendant when he brought his houseboat in for refueling. *Id.* at 1238–39. During the course of their conversation, the officer "brought up the subject of selling marijuana" and suggested that the defendant could make "'a lot of money.'" *Id.* at 1239. The defendant replied that he would "'see what [he] can do'" about supplying the officer with marijuana and provided his contact information. *Id.* The officer subsequently contacted the defendant at least five times

_____

6. To the extent Hatchett is referring to Special Agent's use of the undercover online persona of a 13-year-old boy to contact Hatchett, this, on its own, does not constitute entrapment. "[T]he defense [of entrapment] does not deprive the police of the use of decoys to afford a person an opportunity to commit crime" so long as they refrain from "present[ing] actively, inducements for the purpose of luring a person into the commission of an offense." *State v. Taylor*, 599 P.2d 496, 500 (Utah 1979).

attempting to purchase marijuana before the defendant finally arranged to sell him some. *Id.* at 1240. In reversing the conviction on entrapment grounds, our Supreme Court found significant the facts that the officer was the one to broach the subject of purchasing marijuana from the defendant, he repeatedly contacted the defendant in an attempt to complete the transaction, and "there [was] no evidence that the defendant had previously possessed or dealt in the drug."[7] *Id.* Based on that set

---

7. This third consideration appears at odds with both the entrapment statute and our Supreme Court's more recent articulation of the objective standard. *See State v. Torres*, 2000 UT 100, ¶ 8, 16 P.3d 1242 ("[The] objective standard for entrapment cases . . . focuses solely on police conduct, *rather than on the defendant's predisposition to commit a crime*.") (emphasis added) (citing *State v. Taylor*, 599 P.2d 496, 500 (Utah 1979)). *See also* Utah Code Ann. § 76-2-303(6) (LexisNexis 2017) (providing, with a few exceptions not relevant here, that "[i]n any hearing before a judge or jury where the defense of entrapment is an issue, past offenses of the defendant shall not be admitted"). Indeed, in *Kourbelas*, the Court cited *State v. Curtis*, 542 P.2d 744 (Utah 1975), in support of its consideration of "the fact that there is no evidence that the defendant had previously possessed or dealt in [marijuana]." *State v. Kourbelas*, 621 P.2d 1238, 1240 & n.7 (Utah 1980). But *Curtis* applied the subjective standard that our Supreme Court specifically disavowed in *Taylor*. Under the subjective standard, "the critical issue is whether the particular defendant was predisposed to commit the crime; or was an otherwise innocent person, who would not have erred, except for the persuasion of the government's agents." *Taylor*, 599 P.2d at 500. In *Taylor*, the Court determined that this standard was inconsistent with the entrapment statute. *See id.* at 503 ("There is no provision or phraseology in [section] 76-2-303(1) which can be rationally construed as providing a 'predisposition' or 'innocence' requirement to constitute an entrapment defense. The legislative intent to adopt the objective theory of entrapment is further verified in subdivision (6) of [section] 76-2-303."). *See*

(continued…)

of circumstances, the Court concluded that the officer had entrapped the defendant. *Id.* Subsequent Utah Supreme Court decisions have likewise considered whether law enforcement had reason to suspect their targets of wrongdoing prior to approaching them. *See Torres*, 2000 UT 100, ¶ 12 ("Unlike *Kourbelas*, [the] defendant in this case was known in the community as a 'big mover of drugs.'"); *State v. Udell*, 728 P.2d 131, 133 (Utah 1986) (distinguishing *Kourbelas* and other cases because the "defendant was a known drug user"); *State v. Sprague*, 680 P.2d 404, 406 (Utah 1984) (stating that the defendant's reliance on *Kourbelas* "is well-placed" because, as in *Kourbelas*, it was the undercover agent "who first approached defendant, with no reason to believe that defendant used or sold drugs, and suggested the purchase of drugs," followed by three more attempts before the defendant finally supplied the undercover agent with marijuana).

¶15    But Hatchett's argument on this ground is unsuccessful for two reasons. First, Hatchett overlooks Special Agent's testimony regarding the reasons he chose to investigate Hatchett's advertisement. Based on his Craigslist-specific training to detect posts "related or that could be related to minors," Special Agent testified that many people seeking sexual intercourse with minors "know the law" and "specifically" make law-abiding advertisements when "really wanting [someone]

---

(…continued)
*also Torres*, 2000 UT 100, ¶ 7 n.1 (noting that the entrapment statute "has not been substantially altered since its enactment in 1973"). But despite this disavowal by *Taylor* and its progeny, the subjective standard seems to have crept back into entrapment analysis in this and certain other respects. *Compare Torres*, 2000 UT 100, ¶ 8 ("To prove the defense of entrapment, the evidence must be sufficient to raise a reasonable doubt that the defendant freely and voluntarily committed the offense.") (quotation simplified), *with id.* ("[The] objective standard for entrapment cases . . . focuses solely on police conduct.").

younger." He testified that "key signs" of such advertisements include the use of terms such as "young," "incest," "boy," "girl," "children," "adult children," or "anything that could be related." For that reason, despite expressly stating that he was seeking men between the ages of eighteen and twenty-five, Hatchett's advertisement entitled "Dad looking for Son (Provo)" prompted Special Agent to investigate further whether Hatchett's advertisement was more nefarious than might appear at first glance. And based on this explanation, we reject Hatchett's contention that Special Agent improperly initiated contact without suspicion that Hatchett desired to engage in wrongdoing. *See Torres*, 2000 UT 100, ¶ 14 ("Where it is known or suspected that a person is engaged in criminal activities, or is desiring to do so, it is not an entrapment to provide an opportunity for such person to carry out his criminal intentions.") (quotation simplified).

¶16 Second, even if Special Agent did not suspect Hatchett of having an interest in minors when he initiated contact, the circumstances of this case are sufficiently distinguishable from *Kourbelas* to alter the outcome of the "evaluation of the circumstances." *See Taylor*, 599 P.2d at 503. Unlike the officer in *Kourbelas*, Special Agent did not persistently request that Hatchett commit an illegal offense. Where the undercover officer in *Kourbelas* "followed up" with the defendant after their initial interaction "by calling the defendant at least five times in attempting to purchase the marijuana," 621 P.2d at 1240, Hatchett was subjected to no such persistent effort. To the contrary, Hatchett aggressively pursued Cade after he was made aware of Cade's young age. The district court found that following their initial conversation, Hatchett initiated "at least 16" text-message conversations and "three phone calls" with Cade, and Special Agent initiated only two text-message conversations, one of which was merely to confirm the details of their meeting time on the morning of Hatchett's arrest. This is a meaningful distinction between Special Agent's actions here and those of the undercover officer in *Kourbelas*.

¶17 Moreover, this case is further distinguishable from *Kourbelas* because the undercover officer there was the one "who first suggested the purchase of marijuana from the defendant." *Id.* Here, Special Agent was specifically trained *not* to raise the subject of sex first as a means of determining whether it was the "intent" of the poster of potentially illegal advertisements "to do anything sexual" with his underage undercover persona. And it certainly did not take any prompting for Hatchett to begin engaging in a sexually explicit conversation with someone who said he was a minor. As soon as Cade revealed that he was "almost 14," Hatchett responded, "Nice. How tall, weight?" Cade's answer to that question was then immediately followed by, "Nice. If we do meet up it would have to be our little secret. You a top? Do you like to drink?" For these reasons, Hatchett's reliance on *Kourbelas* is unavailing.

¶18 Finally, we address Hatchett's suggestion that causation is evidence of entrapment. He argues that "[w]ithout . . . police contact, no crime would have ever occurred." But the entrapment statute requires more than a mere showing that law enforcement "induce[d] the commission of [the] offense." Utah Code Ann. § 76-2-303(1) (LexisNexis 2017). It also requires a showing that they did so using "methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it." *Id.* And as discussed above, Hatchett has not demonstrated that Special Agent engaged in any such questionable methods.

CONCLUSION

¶19 For the foregoing reasons, this case does not present a set of circumstances under which "we can hold . . . that reasonable minds cannot differ as to whether entrapment occurred." *State v. Haltom*, 2005 UT App 348, ¶ 7, 121 P.3d 42 (quotation simplified). His contention that Special Agent lacked reason to suspect him of wishing to engage in wrongdoing is unavailing. Additionally, although Hatchett asserts that he "fell for [Special Agent's] trap,"

he does not identify any "methods" that were allegedly "designed specifically to lead" individuals not otherwise ready to entice minors into committing the crime. We agree with the district court's conclusion that, "[a]t most, [Special Agent] afforded [Hatchett] the mere opportunity to commit the offense." *See* Utah Code Ann. § 76-2-303(1) (LexisNexis 2017). Hatchett's entrapment argument therefore fails.

¶20    Affirmed.

————————